IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| EQUAL EMPLOYMENT<br>OPPORTUNITY COMMISSION, | ) | CIV F 02-6199 AWI LJO |
| | ) | |
| Plaintiff, | ) | ORDER ON DEFENDANT'S<br>MOTION FOR NEW TRIAL |
| | ) | |
| OLIVIA TAMAYO, | ) | |
| | ) | |
| Plaintiff-Intervenor, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| HARRIS FARMS, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| _____ | ) | |

After a 23 day jury trial that ended in January 2005, a jury awarded Plaintiff-Intervenor

Olivia Tamayo approximately $1 million.  Defendants have filed several motions.  This is

Defendant's motion for new trial.  Defendant raises four grounds for a new trial: (1) the

admission of irrelevant and remote evidence (Rodriguez's conduct with regard to Hermila

Berrara, Beatriz Ortiz, Maria Martinez, and Josephina Guardado), and the lack of a limiting

instruction, was overly prejudicial and failed to meet the test for "other acts" as established by

the Ninth Circuit; (2) there was no legal basis for the jury's award of punitive damages and

Defendant was unfairly prevented from offering "good faith" evidence, in particular evidence

concerning its current anti-harassment policy and Defendant's efforts regarding the "kidnapping"

of Tamayo's son; (3) the Court failed to limit the retaliation instruction to claims arising in 2001

and not in 1999; and (4) the jury awarded $91,000 for future economic loss, including lost wages and benefits, but it is not possible to determine which portion of the future economic damages is subject to the cap (future economic loss) and which is not (lost wages and benefits).

## I.   ADMISSION OF OTHER ACT EVIDENCE

### *Defendant's Argument*

Defendant argues that Plaintiffs used the alleged harassment of Barrera, Martinez, Ortiz, and Guardado as "other acts" of Defendant to promote their theme that Rodriguez was a serial harasser and that Defendant had a propensity to ignore or fail to take action in response to complaints of sexual harassment.  In order to admit "other act" evidence under Ninth Circuit law, a four part test must be passed: (1) there must have been sufficient proof for the jury to find that defendant committed the act; (2) the other act must not have been too remote in time; (3) the other act must have been introduced to prove a material issue in the case; and (4) the other act must, in some cases, have been similar to the offense charged.  See Duran v. City of Maywood, 221 F.3d 1129, 1132-33 (9th Cir. 2000).  Furthermore, even if the *Duran* test is met, Rule 403 may still prohibit admission of the evidence.  Defendant argues that Plaintiffs cannot meet this test.

Defendant argues that Plaintiffs have failed to meet the first part of this test because the evidence did not qualify as "other acts."  Regarding Barrera, Plaintiffs used the testimony of Hermila and Mattias Barrera as an "other act" of Defendant to show that Defendant had a propensity to ignore or fail to take action to prevent sexual harassment.  The Barrera acts occurred in 1980, a time when hostile environment sexual harassment was not a cause of action, so Defendant's conduct could not be an "other act" because it was impossible for Defendant to fail to investigate and remedy something that did not exist.  Because there was no such thing as hostile environment sexual harassment in 1980, Defendant was under no duty to prevent and investigate it.  Moreover, because the alleged harassment took place in 1980, it was too remote to

2

be admissible.  It took place 13 years prior to the alleged harassment of Tamayo and 19 years prior to Tamayo's first complaint.  See, e.g., Hurley v. Atlantic City Police Dept., 174 F.3d 95 (3d Cir. 1999).

Regarding Ortiz and Guardado, Defendant argues that there was no evidence that these two women were ever harassed and deposition testimony from Tamayo shows that they were not harassed.  Guardado, who was interviewed in conjunction with the 1999 complaints, stated that Rodriguez simply asked if she was going to a flea market and that Rodriguez never disrespected her.[1]  Similarly, Tamayo testified that she heard Ortiz comment about Rodriguez's treatment of other workers, but stated that she herself (Ortiz) was not a victim.  Thus, Rodriguez's acts towards these women were not acts at all and Plaintiffs' repeated references to these acts as evidence of harassment that Defendant ignored was error.  Regarding Martinez, that situation was slightly different.  Martinez complained of harassment in 1997 and an investigation was undertaken.  Tamayo herself participated in the investigation, which led to the suspension and personal sexual harassment training of Rodriguez.  Thus, Martinez's situation did not constitute an "other act" of harassment that was ignored by Defendant.

Also, Defendant argues that the "other acts" were inadmissible because they were not relevant to any material issue in this case and were not similar to any act alleged by Plaintiffs.  Regarding Barrera, that evidence was not relevant, whether to prove a propensity to fail to act or to commit sexual harassment, because it occurred at a time when hostile environment sexual harassment was not recognized.  Likewise, the acts involving Berrara was not similar because of the distinct duties involved in 1980 versus 1999.  Plaintiffs should have been prevented from inferring that Defendant acted similarly in Tamayo's situation, i.e. improperly failed to take appropriate action.

Similarly, the incidents with Martinez, Guardado, and Ortiz were not relevant or similar.

_____

[1]See Joint Trial Exhibit 53 and Defendant's Reply to Plaintiffs' Opposition to Motions in Limine at p.4.

1   There was no evidence that Guardado and Ortiz were harassed, much less that Defendant failed

2   to act.  Furthermore, the evidence regarding Martinez showed that Defendant investigated and

3   acted appropriately.  Thus, there was no similarity.

4        Accordingly, the *Duran* test has not been met and the evidence should have never been

5   admitted.  However, even assuming *arguendo* that Plaintiffs did meet the test, the evidence

6   should have been excluded under 403.  The evidence was prejudicial because it implied that

7   Defendant was liable for these other acts.  This evidence was all the more egregious because of

8   Plaintiffs' continued and repeated inferences that Defendant was aware of the alleged harassment

9   and covered it up rather than take action.  Also, by repeatedly referencing the other acts of

10  harassment, Plaintiffs implied that there was evidence to support a finding that the other

11  harassment occurred or that Defendant ignored it.  "Just as Defendant feared and argued, the jury

12  improperly considered the inadmissible 'other act' evidence in finding Defendant liable."

13  Defendant's Motion for New Trial at 13:6-8.  The other acts' probative value was substantially

14  outweighed by the fact that the alleged other acts were unfairly and improperly held against

15  Defendant.

16        Just as in *Anheiser-Busch*, the admission of the irrelevant evidence improperly tainted a

17  verdict and warranted a new trial.  In that case, just like here, the evidence "left the jury with the

18  unrebutted impression that [defendant] had for years" violated the law.  <u>Anheiser-Busch, Inc. v.</u>

19  <u>Natural Beverage Distributors</u>, 69 F.3d 337, 347 (9th Cir. 1995).  Also, the failure to give a

20  limiting instruction compounded the error, although Plaintiffs' repeated interjection of

21  prejudicial and inadmissible evidence likely could not have been cured with a limiting

22  instruction.

23        *Plaintiffs' Opposition*

24        Plaintiffs argue that Defendant's motion in limine was granted in that evidence

25  concerning the four women was relevant to show Tamayo's state of mind.  Plaintiffs argue that

26  the ruling on the limine motion was in line with Supreme Court precedent that has made it clear

27

28                              4

that whether a work environment is hostile must be judged from "all of the circumstances." See Harris v. Forklift Syst., 510 U.S. 17, 23 (1993). Furthermore, courts recognize that one's environment is shaped not only by harassment directed at the plaintiff, but also by treatment against others, even if that is learned by the plaintiff second-hand. See Robinson v. Jackson Shipyards, 760 F.Supp. 1486, 1499 (M.D. Fla. 1991).

With respect to Maria Martinez, Plaintiffs argue that Defendant agreed that it would not be pursuing its motion in limine regarding any harassment involving Maria Martinez. Defendant also agreed to joint trial exhibits that detailed Martinez's complaints against Rodriguez. Also, Rule of Evidence 103 requires a timely motion to strike or an objection in order to allege an error in the admission of evidence. Because Defendant did not object, it waived error.

Plaintiffs make similar arguments regarding Ortiz and Guardado. These women were identified by Tamayo as potential witnesses in the 1999 complaint and they were specifically referenced in Defendant's report. In fact, Shirley Ollech noted that she found Tamayo credible in part because statements by Guardado and Ortiz indicated that Rodriguez had sought out other females in an effort to be friendly, which may be interpreted as romantic interest. Moreover, Guardado and Ortiz did not testify at trial; rather, it is Defendant's own documentation of their statements that Defendant objects to. Defendant designated documents containing statements by Guardado and Ortiz as joint exhibits. Furthermore, Defendant failed to object to the documents and testimony concerning these women.

Regarding Hermila and Mattias Barrera, these individuals testified on December 1, 2005. Despite Defendant's representation that it "immediately recognized" the harm and confusion that the testimony would cause, Plaintiffs argue that Defendant made no contemporaneous objection and instead waited to January 4, 2005, to object by filing a motion to strike. Plaintiffs responded by arguing that the evidence was not too remote because Rodriguez used the Barrera incident in order to perpetrate harassment against Tamayo. Rodriguez used the incident to show that he fought with Mr. Barrera and would fight Tamayo's husband over Tamayo. Plaintiffs also argued

it showed that, despite Tamayo reporting to Defendant, Defendant did not follow up.  Plaintiffs also argue that, between the time of the Barreras's testimony and the motion to strike, Defendant could have objected during the testimony of the Barreras and also during the testimony of Shirley Ollech and Sylvia Gomez, but failed to do so.

Plaintiffs also argue that Defendant has failed to prove that admission of the comments were unfairly prejudicial under Rule 403.  Moreover, defense counsel reinforced the testimony during closing argument.

Finally, regarding the lack of limiting instruction, Plaintiffs argue that because a limiting instruction was not requested, the issue was waived.  See Gilchrist v. Jim Slemons Imports, Inc., 803 F.2d 1488, 1501 (9th Cir. 1986).  Moreover, Defendants failed to take advantage of repeated invitations by the court regarding limiting instructions.

*Defendant's Reply*

With respect to the failure to object, Defendant argues that it is well established that no further objection is required when the issue has been fully explored and any further objection would be futile.  See, e.g., United States v. Palmer, 3 F.3d 300, 304 (9th Cir. 1993).  Here, the issue of other act evidence was fully addressed and it was clear from the Court's pre-trial rulings that further objection would be meaningless.  "The Court generously allowed all other act evidence to be admitted without limitation, whether it was offered for its promised purpose or not."  Reply at 4.

As to Rule 403, Defendant argues that it showed that the evidence had little or no probative value and that it was highly prejudicial.  Plaintiffs portrayed these women as a group of ignored victims, despite the fact that two said they were never harassed, one was allegedly harassed before there was hostile environment, and the other had her claims fully investigated.

With respect to a lack of limiting instruction, the Ninth Circuit has held that, much like objections, an objection to the inclusion or admission of an instruction is not necessary where such an act would be futile.  See Hangarter v. Provident Life and Accident Ins. Co., 373 F.3d

998, 1012 (9th Cir. 2004). This is an exception to Federal Rule of Civil Procedure 51. Here, because the Court was fully aware of Defendant's objection to the other act evidence. "Defendant presented its objection in its motions in limine and reasserted and briefed its objection to the evidence during trial, to no avail." Reply at 7. A formal objection to the jury instructions would have been futile and thus, was unnecessary.

*Discussion*

**1.      Defendant's Motion in Limine No. 2**

The issue of other alleged harassment against other women was first raised in Defendant's motions in limine no. 2. In that motion, Defendant sought to exclude, "Any mention or reference to incidents or allegations of sexual harassment involving [Tamayo's] alleged harasser against other employees that were not witnessed by [Tamayo.]" Defendant's Motion in Limine No. 2. In this motion, Defendant argued that it has been consistently held that a party making allegations of sexual harassment cannot rely on alleged accounts of sexual harassment against other employees that are not witnessed to prove a case of sexual harassment. See Biggs v. Nicewonger Co., Inc., 897 F.Supp. 483, 485 (D. Or. 1995); Beyda v. City of Los Angeles, 65 Cal.App.4th 511 (Cal. Ct. App. 1998); see also Brooks v. City of San Mateo, 214 F.3d 1082 (9th Cir. 2000) (holding that harassment directed toward others of which an employee is unaware can have no bearing on whether she reasonably considered her working environment to be abusive).[2] Defendant also argued that it would be highly prejudicial to Defendant's liability defense if the Plaintiffs are permitted to admit evidence of any alleged harassment against other female employees by the alleged harasser, and would violate 403.

Plaintiffs responded by arguing that the Supreme Court has made it clear that whether a work environment is hostile is determined by looking at all of the circumstances. Harris v. Forklift Syst., 510 U.S. 17 (1993). Thus, courts have recognized that one's environment is shaped not only by direct harassment, but also by the treatment of other persons of the victim's

---

[2]This case was superseded by *Brooks v. City of San Mateo*, 229 F.3d 917 (9th Cir. 2000).

1   protected class, "even if the treatment is learned second-hand." Robinson v. Jackson Shipyards,

2   760 F.Supp. 1489 (M.D. Fla. 1991).  Plaintiffs argued that *Biggs* actually helped them and is

3   what Plaintiffs want.  *Biggs* held, "Evidence as to alleged incidents of sexual harassment to

4   which Biggs had knowledge is admissible.  However, evidence relating to alleged incidents of

5   sexual harassment not witnessed by Biggs or not related to her while she was on the job are not

6   relevant to prove a hostile work environment in this case." *Biggs*, 897 F.Supp. at 485.  Plaintiffs

7   argued that Tamayo may not have witnessed the harassment of Barrera, Oritz, Martinez, and

8   Guardado, but she had "full knowledge" of the incidents and those incidents impacted the

9   conditions of Tamayo's employment, and were a factor encouraging her to stay silent.  Plaintiffs

10   argued that the probative value of the evidence of other incidents, i.e. Tamayo knew that

11   Rodriguez made inappropriate sexual advances towards other females with relative impunity,

12   made it more likely than not that her terms and conditions of employment were impacted.  The

13   evidence also explained why she refrained from complaining to defendant about her situation and

14   showed that defendant was aware of Rodriguez's conduct and yet failed to ensure Tamayo's

15   safety.  Plaintiffs argued that the evidence was thus highly relevant and this relevance was not

16   substantially outweighed by unfair prejudice.

17          Defendant replied that the courts have clearly established that, without personal

18   knowledge of other acts of alleged harassment, a plaintiff cannot introduce such evidence to

19   prove a hostile work environment.  Furthermore, under *Brooks*, a plaintiff must have obtained or

20   received knowledge of that information during the period of the plaintiff's harassment.

21   Consistent with this case law, Defendant agreed to except Maria Martinez from these motions

22   because Tamayo did have personal knowledge of Martinez's experience with Rodriguez.

23   Defendant argued that Plaintiffs attempted to bypass the law by asserting that Tamayo did in fact

24   have knowledge of alleged harassment against other employees.  However, Defendant argued

25   that Plaintiffs failed to offer any evidence to support this assertion.

26          At the motions in limine hearing, the Court made initial admonishments to the parties

27

28                                                    8

before discussing the motions in limine themselves.  The Court advised the parties:

> If, however, during the course of trial, you believe that circumstances have changed such that I should reconsider a ruling on a motion in limine, you're certinaly free to do that.  Especially on those motions where perhaps I've ruled because there was some uncertainty about what a particular witness might say or whatever and so feel free to – I should say don't hesitate to ask the Court to reconsider.
> . . . . . . . .
>
> The other thing, if I make a ruling on a motion in limine and you believe that that would then trigger some kind of requirement of a cautionary or special instruction to the jury, feel free to generate such a proposed instruction and we'll take it up right at the beginning of the trial.  And if it turns out that there is an appropriate, for example, limiting instruction to be given during the testimony of a witness, then I'll certainly consider that and rule on whether or not I would give that instruction and when I would give it.

November 22, 2004, Transcript of Motion in Limine Hearing at 8:24-9:20.

At the hearing, Defendant agreed that the "Maria Martinez matter can come in because Ms. Tamayo was interviewed."  Id. at 44:6-7 (from rough draft, official verison is in record).  With respect to Ortiz, Berrara and Guardado, Defendant argued that there were no witnesses who saw or could talk about harassment and that the incidents merely came to Tamayo through the grapevine.  See id. at 44-45.  After listening to arguments, the Court made the following ruling:

> With respect to the factual underpinnings of other incidents, specifically, as I understand it, incidents of alleged inappropriate sexual advances towards Maria Martinez, Hermila Barrera, Josephine Guardado, and Beatriz Ortiz, it sounds to me it's almost like we're talking here about questions of fact for the jury to decide, credibility, etc., and not things that I can rule on as a matter of law.  So I'm going to **grant** the motion that evidence of other incidents, involving other individuals, are not admissible except to show as evidence of sexual harassment or – and/or an explanation for the failure to complain by Ms. Tamayo.  Both sides have cited *Biggs*.  *Biggs* is very clear.  Evidence as to alleged incidents of sexual harassment, to which the complainant had knowledge, is admissible.  So one criteria, of course, is there has to be testimony that Ms. Tamayo had knowledge of these other incidents.  However, evidence relating to alleged incidents of sexual harassment not witnessed by the complainant nor related to the complainant while she was on the job are not relevant to prove the hostile work environment aspect of the sexual harassment case.  So there has to be that element of knowledge.  And then with respect to whether or not these alleged incidents between Mr. Rodriguez and these other individuals were or were not of a sexual nature, or inappropriate, that might be relevant to a sexual harassment claim or information that might reasonably, if she had knowledge, had caused Ms. Tamayo to not complain immediately, would be relevant and admissible.

Id. at 49:14-50:15 (emphasis added).

9

1    Although the motion in limine was rather contentious, both sides essentially wanted the

2   same things, that is, both sides essentially requested that the Court adopt the rule stated in *Biggs*.

3   In *Biggs*, the district court issued the following order:  "Evidence as to alleged incidents of sexual

4   harassment to which Biggs had knowledge is admissible.  However, evidence relating to alleged

5   incidents of sexual harassment not witnessed by Biggs or not related to her while she was on the

6   job are not relevant to prove a hostile work environment in this case."  Biggs, 897 F.Supp. at

7   485.  This rule, which is consistent with Ninth Circuit precedent, has been utilized by many

8   courts in finding such evidence relevant and admissible to prove hostile environment sexual

9   harassment.  See Brooks v. City of San Mateo, 229 F.3d 917, 924 (9th Cir. 2000); Hirasi-Doi v.

10  U.S. West Communs., Inc., 61 F.3d 777, 782-83 (10th Cir. 1995); Dias v. Sky Chefs, Inc., 919

11  F.2d 1370, 1377 (9th Cir. 1990); Hall v. Gus Const. Co., 842 F.2d 1010, 1015 (8th Cir.1988);

12  Melton v. Five Four, Corp., 82 Fair Empl. Prac. Cas. (BNA) 124, 131 n.3 (N.D. Ill. 2000); Taylor

13  v. Cameron Coca-Cola Bottlling Co., 71 Empl. Prac. Dec. (CCH) P44967 (W.D. Pa. 1997);

14  Campbell v. Board of Regents of State of Kansas, 770 F.Supp. 1479, 1486 n.1 (D. Kan. 1991);

15  Robinson v. Jackson Shipyards, 760 F.Supp. 1489, 1499 (M.D. Fla. 1991).

16      **2.    Trial**

17    During trial, Defendant did not contemporaneously object to evidence concerning

18  Martinez, Barrera, Ortiz, or Guardado.[3]  If Defendant believed that the Court's orders were being

19  ignored or that its orders should be amplified beyond what they forbade, then Defendant was

20  required to make a contemporaneous objection.  See Fed. R. Evid. 103(a); Kelly v. City of

21  Oakland, 198 F.3d 779, 786 (9th Cir. 1999); Comments to 2000 Amendment to Fed. R. Evid.

22  103 (citing United Stats Aviation Underwriters, Inc. v. Olympia Wings, Inc., 896 F.2d 949, 959

23  (5th Cir. 1990) ("objection is required to preserve error when an opponent, or the court itself,

24

25       [3]Trial counsel for the EEOC has submitted an affidavit that states Defendant did not make objections or
26  request limiting instructions.  This appears to be in lieu of citing to the record and shows that both sides find it
    difficult to wade through transcripts.  Nonetheless, Defendant makes no objection or attempt to controvert Ms.
27  Ordonio-Dixon's affidavit.

28                            10

violates a motion in limine that was granted")).  It is true that when a court is on notice and has

thoroughly explored the substance of a party's objection and has definitively ruled without the

possibility of a different ruling on a renewed objection, requiring additional contemporaneous

objections is futile and not required.  See Mukhtar v. California State University, 299 F.3d

101053, 1062 (9th Cir. 2002); United States v. Varela-Rivera, 279 F.3d 1174, 1177-78 (9th Cir.

2002); Palmer, 3 F.3d at 304.  However, the exception to Rule 103(a) does not aid Defendant.

Before the Court ruled on any motion in limine, it gave permission for the parties to renew

objections or motions.  Furthermore, the Court granted Defendant's motion in limine and

imposed the rule enunciated in *Biggs*, a case that Defendant cited with approval and a rule

essentially requested by Defendant through its moving papers.  Additionally, Defendant did not

object to the admission of evidence concerning Ortiz, Guardado, or Martinez on the basis of Rule

404(b).  The court was not on notice of Defendant's objection on the basis of that evidentiary

rule.  Accordingly, Defendant does not fit within the exception to the requirement of a

contemporaneous objection; Defendant was required to object to preserve error.  Cf. Palmer, 3

F.3d at 304.

   With respect to the testimony of Mattias and Hermila Barrera, Defendant did file a

motion to strike testimony.  In the motion, Defendant argued that the testimony should be struck

because it was not permissible "other act" evidence under Rule 404(b).  As recited above,

Defendant argued that the Barreras' testimony could not be an "other act" under 404(b) because

hostile environment sexual harassment was not recognized in 1980, that the incident was too

remote in time to be probative, that the testimony was irrelevant, and that the testimony should

be stricken under Rule 403.

   At trial,  the Barreras testified on December 1, 2004, but the motion to strike was filed on

January 4, 2005.  Rule of evidence 103 requires a "timely objection" in order for an error in the

admission of evidence to be reviewed.  See Fed. R. Evid. 103(a).  "Failure to make a timely

objection constitutes a waiver of that objection."  United States v. Rivera, 47 F.3d 1291, 1295

11

(9th Cir. 1995).  In _Rivera_, an objection to testimony was found untimely when the objection was made after the witness's direct, cross, and redirect examinations.  See id.; see also Central Telecommunications, Inc. v. TCI Cablevision, Inc., 610 F. Supp. 891, 906 (W.D. Mo. 1985) (holding motion to strike testimony made the day after the witness testified was untimely).  Here, more than one month passed before the motion to strike was made.  Defendant argues it "immediately recognized" that the damaging nature of the Barreras' testimony.  See Motion for New Trial at 4:18-19.  Despite the immediate recognition, no objection or motion to strike was made during the direct, cross, or redirect examination of the Barreras; instead, the motion to strike was made more than 30 days later.  Defendant failed to timely object and thus, failed to preserve error.  See Fed. R. Evid. 103(a); Rivera, 47 F.3d at 1295; Central Telecommunications, 610 F.Supp. at 906; see also United States v. Meserve, 271 F.3d 314, 325 n.3 (1st Cir. 2001).

Even if Defendant did preserve error, the Barreras' testimony was relevant and probative because Rodriguez himself used the incident to frighten and control Tamayo.  Although hostile environment sexual harassment may not have been recognized in 1980, the conduct still dealt with inappropriate sexual and violent behavior.  Because Rodriguez utilized this past "remote" conduct, it became part of the current situation and environment facing Tamayo.  The evidence goes to Tamayo's state of mind and helps to explain why she did not report Rodriguez sooner; it further aides in establishing a hostile work environment.  See Brooks, 229 F.3d at 924; Hirasi-Doi, 61 F.3d at 782-83; Dias, 919 F.2d at 1377; Hall, 842 F.2d at 1015; Melton, 82 Fair Empl. Prac. Cas. (BNA) at 131 n.3; Taylor, 71 Empl. Prac. Dec. (CCH) P44967; Robinson, 760 F.Supp. at 1499.  Also, the harassment of Hermila Barrera was similar in that Rodriguez used it as an example of how he would fight a husband in order to have his way with the wife.  Finally, the probative value of the evidence is high and is not substantially outweighed by its potential for unfair prejudice, given the issues in this case.

### 3.   No Limiting Instruction

Defendant's argument that there was no limiting instruction is not persuasive.  In its

reply, Defendant argues that no objection or request for an instruction was necessary because the Court was aware of Defendant's concerns and an objection or instruction would have been futile. Defendant relies on cases construing Federal Rule of Civil Procedure 51, which requires a party to object to the giving or the failure to give an instruction in order to preserve error. The exception to Rule 51 is similar to that of objecting to the admission of evidence, where the Court is aware of the parties's concern, and further objection would be unavailing, no further objection is required. See Hangarter, 373 F.3d at 1012.

Here, the Court did not indicate that a request for a limiting instruction would have been futile. In fact, the Court indicated precisely the opposite. Before the motions in limine were ruled upon, the Court made it clear that it would entertain limiting instructions, but that the parties needed to present those instructions to the Court. See Transcript of November 22, 2005, Motions In Limine Hearing at 8-9. Next, the Court granted Defendant's motion in limine no. 2 and indicated that the evidence of conduct directed at other women that was witnessed or reported to Tamayo would be admissible to show a hostile environment and to show state of mind, i.e. limited purposes. Despite this ruling, Defendant never requested or presented the Court with limiting instructions. Next, after ruling on Defendant's Motion to Strike the Barreras's testimony, the Court stated, "as I mentioned earlier on the motions in limine, if the parties believe that there should be some cautionary or limiting instruction, then we can certainly do that and I'll consider that at the appropriate time whether I feel it should be given during the course of trial or as part of the concluding jury instructions." Transcript of January 7, 2005, Motion to Strike Hearing at 11:21-12-1. Defendant has failed to show that the Court had definitively refused to give an instruction such that further objection would have been futile; in fact, the record reflects that the Court was amenable to such an instruction to be proposed by Defendant, but Defendant failed to do so. "If a limiting instruction is not requested, any error from failing to give it is waived." Gilchrist, 803 F.2d at 1501; Brocklesby v. United States, 767 F.2d 1288, 1293 (9th Cir. 1985); see also Fed. R. Civ. Pro. 51; Monroe v. City of Phoenix, 248

F.3d 851, 858-859 (9th Cir. 2001); <u>Larez v. City of Los Angeles</u>, 946 F.2d 630, 638 (9th Cir. 1991); <u>United States v. Multi-Management, Inc.</u>, 743 F.2d 1359, 1364 (9th Cir. 1984) (holding that "where no limiting instruction is requested concerning evidence of other criminal acts, the failure of the trial court to give such an instruction *sua sponte* is not reversible error"). Defendant has waived any error by failing to request a limiting instruction to the jury.

In summary, Defendant failed to timely object to the evidence concerning Barrera, Ortiz, Guardado, and Martinez, and never requested a limiting instruction. Moreover, Defendant's motion in limine with respect to evidence concerning these women was granted. If Defendant believed that the in limine order was being disobeyed, or that circumstances had changed, then Defendant should have made an objection or asked for reconsideration. The Court made it clear, as early as the hearing on the motions in limine, that the parties were permitted to ask for reconsideration and that the Court would entertain limiting instructions.[4] This ground for new trial is denied.

**4.      Improper Use Of Evidence During Opening and Closing Statements**

*Supplemental/Clarified Argument*

At oral argument and through supplemental briefing, it was clarified that Defendant also argued attorney misconduct. Specifically, Defendant argues that Plaintiffs repeatedly and emphatically used the evidence of other harassment as a pattern of disregard by Defendant and serial harassment. With respect to Maria Martinez, Beatrice Ortiz, and Josephina Guardado, the use of the evidence by Plaintiffs entitles Defendant to a new trial because Plaintiffs continued to argue that they were "four victims of harassment" whose complaints were ignored. With respect to Barrera, the evidence was not offered for a limited purpose. Rather, Mrs. Barrera testified to her alleged harassment and Defendant's response, and Plaintiffs used it as the first glaring example of Defendant's propensity to ignore complaints. In a supplemental reply, Defendant

---

[4]The Court also notes that Defendant was able to argue that Ortiz and Guardado were not actually harassed and also to argue that it timely and appropriately responded to complaints by Maria Martinez.

cites to transcript excerpts of the opening statements and closing arguments and argues that the various excerpts show how Defendant misused the testimony/evidence concerning Martinez, Oritz, Barrera and Guardado.  See Transcript of December 1, 2004, at pp. 4, 5, 7, 8, 12, 24, 27, 28, 29, 32, 33; Transcript of January 20, 2005, at pp. 148, 196, 197, 198, 199, 205, 206, 279, 280; Transcript of January 21, 2005, at p. 332.

*Discussion*

"A new trial is warranted on the ground of attorney misconduct during the trial where the flavor of misconduct sufficiently permeates an entire proceeding to provide conviction that the jury was influenced by passion and prejudice in reaching its verdict." Settlegoode v. Portland Public Schools, 371 F.3d 503, 516 (9th Cir. 2004); Doe ex. rel. Rudy-Glanzer v. Glanzer, 232 F.3d 1258, 1270-1271 (9th Cir. 2000); Anheuser-Busch, Inc. v. Natural Beverage Distributors, 69 F.3d 337, 346 (9th Cir. 1995).  Improper and inflammatory jury argument and violations of motions in limine by counsel may both constitute attorney misconduct.  See Bird v. Glacier Elec. Coop., Inc., 255 F.3d 1136, 1152 (9th Cir. 2001); Anheuser-Busch, 69 F.3d at 345-47.  A party should object to alleged instances of attorney misconduct before the jury deliberates.  See Kaiser Steel Corp. v. Frank Coluccio Constr. Co., 785 F.2d 656, 658 (9th Cir. 1986).   There is an even "higher threshold" for granting a new trial where defendants fail to object to the alleged misconduct during trial.  Settlegoode, 371 F.3d at 516-17; Mahone v. Lehman, 347 F.3d 1170, 1174 n.1 (9th Cir. 2003); Kaiser Steel Corp., 785 F.2d at 658.  A higher threshold is necessary for two reasons: "First, raising an objection after the closing argument and before the jury begins deliberations 'permit[s] the judge to examine the alleged prejudice and to admonish . . . counsel or issue a curative instruction, if warranted.'"  Settlegoode, 371 F.3d at 516-17; Hemmings v. Tidyman's Inc., 285 F.3d 1174, 1193 (9th Cir. 2002); Kaiser, 785 F.2d at 658.  "There is a strong presumption that the curative instructions given by the district court [are] followed by the jury;" thus, prejudice resulting from attorney misconduct may generally be remedied by a curative instruction to the jury to disregard the misconduct.  See Doe, 232 F.3d at 1270-71; see also

15

1   B.K.B. v. Maui Police Dep't, 276 F.3d 1091, 1105 (9th Cir. 2002); Barzelis v. Kulikowski, 418

2   F.2d 869, 871 (9th Cir. 1969).  Second, "allowing a party to wait to raise the error until after the

3   negative verdict encourages that party to sit silent in the face of claimed error."  Hemmings, 285

4   F.3d at 1193.  Where there is no objection, a new trial is warranted where the attorney's

5   misconduct amounts to fundamental error, that is (1) an error; (2) that the error was plain or

6   obvious; (3) that the error was prejudicial or affected substantial rights; and (4) that review is

7   necessary to prevent a miscarriage of justice.  See Settlegoode, 371 F.3d at 517; Hemmings, 285

8   F.3d at 1193; Bird, 255 F.3d at 1146.  However, if the misconduct permeates the proceeding,

9   constant objections are not required because they could antagonize the jury.  Anheuser-Busch, 69

10  F.3d at 346.

11          Here, many of the referenced passages do not go as far as Defendant argues.  With respect

12  to the opening statements, many of the excerpts have a basis in the evidence that was presented

13  to the jury or are rather innocuous in context.  The excerpts at pages 4 and 5 are argument by

14  Plaintiffs' counsel that Defendant took inadequate action regarding harassment and did not care

15  about the laws that protect workers.  In context, the statements deal with an argument that

16  Defendant had an ineffective harassment policy and inadequately protected Tamayo against

17  harassment and retaliation.  The adequacy of Defendant's harassment policy and its responses to

18  the harassment of Tamayo were issues in the case as part of Defendant's *Faragher/Ellerth*

19  defense and Plaintiffs's hostile work environment by a non-immediate supervisor claim.  See

20  Ninth Circuit Model Instructions §§ 12.2B, 12.2C.

21          The excerpts on pages 7 and 8, which are statements regarding inadequate staffing by

22  Defendant and the assertion that Tamayo was not the first person whom Rodriguez harassed,

23  were made in the context of a lack of full time human resources consultant.  The assertion that

24  Tamayo was not the first to be harassed by Rodriguez was followed by statements that

25  Defendant's human resources consultant at some point conducted interviews with other

26  employees who described behavior that they believed was inappropriate by Rodriguez.

27

28                                                  16

The statement on page 12 that Defendant did not tell Deputy Crittenden about other women harassed by Rodriguez was in the context of incomplete information given to Crittenden. The page 12 statement is non-specific and would have certainly covered the incident three years earlier with Maria Martinez.

The statements on pages 27, 28, 29, 32, and 33 which indicate that Defendant knew that Rodriguez had sexually harassed at least three women but kept him as a supervisor and let him retire without suspension or discharge, are in the context Defendant's knowledge and the reasonableness of its conduct.[5]   The argument relates to tolerance of harassment/effectiveness of the anti-harassment policy.  Additionally, the three women are not identified.  The three women may be Tamayo, Maria Martinez, and Hermilla Barrera.  Tamayo's complaints and Martinez's complaints about Rodriguez were certainly known to Defendant as investigations resulted.  It also appears that at least one supervisor, Nicholas Perez, knew about the incident with Hermilla Barrera because Perez confirmed to Tamayo that a confrontation between Rodriguez and Barrera's husband had occurred.  Additionally, the evidence indicated that Rodriguez told Tamayo that his relative, Rafael Reyna, destroyed the paperwork on the incident in Rodriguez's file.  There is thus some basis for arguing that Defendant was aware of the Barrera incident.

Finally, with respect to page 24, the excerpt is a statement that this case is about whether Defendant can be held responsible for its conduct of allowing Rodriguez to roam freely and do

---

[5]The Court never expressly ruled on the propriety of using the incidents with Barrera, Ortiz, Guardado, and Martinez to show knowledge by Defendant.  At the motion in limine hearing, Tamayo's personal counsel asked whether the Court was foreclosing use of the evidence to show employer knowledge.  See November 22, 2004, Hearing at 52:20-25.  The Court responded that it was not precluding the use of the evidence to show employer knowledge, but that the Court was not specifically addressing the issue of employer knowledge.  See id. at 53:1-18.  The Court emphasized that employer knowledge was a separate issue and that specific evidence would be necessary to show employer knowledge of the incidents.  See id.  After the motions in limine hearing, use of the evidence to show employer knowledge was not addressed further.  Thus, after the in limine hearing, use of the Barrera, Ortiz, Guardado, and Martinez incidents to show employer knowledge was not foreclosed, but to use the evidence to show employer knowledge, specific evidence of knowledge was necessary.  Other courts have held that prior incidents of harassment or reports of harassment concerning a harasser may be relevant to show employer knowledge.  See Hirase-Doi, 61 F.3d at 784; Paroline v. Unisys Corp., 879 F.2d 100, 107 (4th Cir. 1989); Zupan v. Illinois, 1999 U.S. Dist. LEXIS 7776, *19-*20 (N.D. Ill. 1999); Van Jelgerhuis v. Mercury Finance Co., 940 F.Supp. 1344, 1364 (S.D. Ind. 1996); Ragge v. MCA/Universal, 165 F.R.D. 601, 604 (C.D. Cal. 1995).

things to Tamayo and other women.  This excerpt is more troubling as this case is about conduct

occurring to Tamayo.  However, as discussed above, other conduct directed at others similarly

situated to Tamayo and known to Tamayo is relevant in establishing a hostile work environment.

Although perhaps not the best statement, it was made in opening statement and Defendant had

the opportunity to rebut the statement and characterization of the case.

With respect to misconduct in closing argument, the complained of excerpts are similar to

those made during opening statement.  The statement on page 148 indicated Defendant should

have fired Rodriguez and had a duty to do so in order to make the workplace safe for Tamayo

and others like her.  In context, however, the statement is made in response to defense counsel's

point that Defendant's employees were at will and could be terminated for any reason.  Given

Tamayo's and Maritnez's situations, it is not unreasonable to argue that Rodriguez, as an at will

employee, should have been fired.

The excerpt from page 196 is that Rodriguez was a workplace bully and Defendant knew

it and employed him for 25 years.  In context, the statement refers to testimony that Rodriguez

would yell at Tamayo and throw weeds at her.  Tamayo's counsel also specifically pointed out

Rodriguez's demeanor on the stand, and Rodriguez's demeanor was volatile.  The argument goes

to the reasonableness of efforts to prevent workplace harassment and the reasonableness of

keeping Rodriguez in a supervisory capacity.

The statements on page 197 deal with the possible destruction of paperwork over the

Barrera incident and Defendant allowing Rodriguez to deliver bathrooms to women after they

knew of his "propensities" to harass, having caught him twice before.  To the extent that

Plaintiffs characterized the incident with Barrera as a sexual harassment complaint, that

characterization is not accurate.  At the time of the Barrera incident, it does not appear that

hostile work environment sexual harassment was a cause of action (as described in Defendant's

briefing).  Moreover, it is not clear that a formal complaint was filed or what was contained in

that complaint, although there was an indication that paper work was destroyed.  It is more

reasonable to refer to the situation as the "Barrera incident."  However, even if hostile work environment sexual harassment was not recognized, Rodriguez's alleged conduct was clearly inappropriate and harassing.  Further, one of Defendant's supervisors confirmed to Tamayo that there had been troubles between Rodriguez and Berrara, and Tamayo related the Berrara incident to the human resources department, including Rodriguez's ties to Rafael Reyna, when she first complained of harassment in 1999.  In context, the arguments on page 197 go to the reasonableness of Defendant's conduct and the reasonableness of the conclusions it made regarding its investigations and prevention of a hostile work environment.

The excerpts on pages 279 and 280 are requests by Plaintiffs' counsel to the jury to consider the Barreras's testimony and to consider Joint Exhibits 26 and 53.  First, joint exhibits are admissible by agreement and could be admitted and used by both parties.  If Defendant wished a limitation on an exhibit, it should have brought the issue to the attention of the court or not agreed to classify them as "joint exhibits."  Second, the statements in the excerpts are in response to defense counsel's assertion that in order to believe Plaintiffs, the jury would have to disbelieve 14 witnesses.

The excerpt from pages 198 to 199 deals with co-worker harassment and Plaintiffs' counsel states that given the standard that a defendant knew or should have known of the harassment, the Defendant knew or should have known of Rodriguez's propensities as he had been employed by Defendant for many years and had two previous charges of harassment against him.  Plaintiffs then argued that there was probably a trail of other women who were too scared to come forward.  This argument is more suspect.  However, given the length of time that Rodriguez was employed, his demeanor on the stand in front of the jury, and his conduct towards Hermilla Barrera, Maria Martinez, and Tamayo, it is not an unreasonable deduction that there are other women who may have been harassed that Defendant should have known about.[6]

---

[6]Additionally, as discussed in footnote 4 *supra*, prior instances or reports of harassment may be used to show employer knowledge.  See Hirase-Doi, 61 F.3d at 784; Paroline, 879 F.2d at 107; Zupan, 1999 U.S. Dist. LEXIS 7776 at *19-*20; Van Jelgerhuis, 940 F.Supp. at 1364; Ragge, 165 F.R.D. at 604.

Also, the standard is not, as Plaintiff's argument implies, that the Defendant knew or should have known of "propensities," the standard is knew or should have known of the harassment. See Burrell v. Star Nurseries, Inc., 170 F.3d 951, 955 (9th Cir. 1999).   However, the Court gave an instruction before closing arguments that the argument of the attorneys is not evidence, the law was correctly stated in the jury instructions, and the jury did not answer the verdict question or make a finding on co-worker harassment because of their answers to verdict questions regarding the harassment by a supervisor claim.  See Court's Docket at 210 & 234.

The excerpts from pages 205 and 206 deal with believing Rodriguez's testimony denying the entirety of the Barrera incident and Defendant giving disproportionate discipline to alleged gossipers and Tamayo as compared to Rodriguez, "a three time loser."  The attacks on the credibility of Rodriguez are not inappropriate, especially given the reliance on Rodriguez's testimony by the defense.  Furthermore, it is not inappropriate to argue that the more incredible Rodriguez's testimony is, the less reasonable Defendant's conduct toward or believing Rodriguez was.  Also, it is not unreasonable in light of the constructive discharge and retaliation causes of action to argue that Tamayo and her witnesses's punishment for the 2001 gossip complaints was disproportionate to that received by Rodriguez, given the allegations and incidents involving Rodriguez.  It is not clear to which incidents the "three time loser" refer.  If it refers to Maria Martinez and Tamayo, those incidents were investigated and known by Defendant.  If it also refers to Barrera, as described previously, there was evidence suggesting that Defendant had knowledge of the inappropriate behavior.

After reviewing the excerpts cited by Defendant in support of their claim of misconduct through misuse of evidence/improper argument, the Court cannot say that a new trial is warranted.  Some of the comments by Plaintiffs' counsel are questionable and arguably improper.  However, the Court did instruct the jury prior to the beginning of closing argument that argument by counsel was not evidence.  See Court's Docket No. 234; Ninth Circuit Model Jury Instructions § 3.3.  Furthermore, the jury was instructed as to the appropriate governing law.

20

1    Most importantly, Defendant did not object to the above excerpts.  Normally, a new trial is not

2    warranted unless the misconduct sufficiently permeated the entire proceeding and creates the

3    conviction that the jury was influenced by passion and prejudice in reaching its verdict.

4    Settlegoode, 371 F.3d at 516; Doe ex. rel. Rudy-Glanzer, 232 F.3d at 1270-1271.  Since there

5    was no objection, Defendant must meet an even higher threshold.  See Settlegoode, 371 F.3d at

6    516-17; Mahone, 347 F.3d at 1174 n.1; Kaiser Steel Corp., 785 F.2d at 658.  Considering the

7    context of the various excerpts, the evidence presented, and the issues of the case, even if some

8    of the excerpts constitute misuse/misconduct, the Court cannot say that misconduct sufficiently

9    permeated the entire proceeding such that the jury was improperly influenced by passion and

10   prejudice nor, in the absence of a timely objection, can the Court say that the arguments caused

11   the integrity or fundamental fairness of the proceedings to be called into question.  See Bird, 255

12   F.3d at 1148; Doe ex. rel. Rudy-Glanzer, 232 F.3d at 1270-71; Anheuser-Busch,  69 F.3d at 346.

13

14   **II.     PUNITIVE DAMAGES**

15   **A.      Evidence of Good Faith**

16           *Defendant's Argument*

17           Defendant argues that the Court's ruling on Defendant's evidence of good faith regarding

18   punitive damages was erroneous and prejudicial.  Defendant argues that it raised the issue in their

19   motions in limine.  Specifically, Defendant argues that evidence of its post-2001 policies and

20   actions were relevant to punitive damages.  Under *Kolstad*, an employer "may avoid liability for

21   punitive damages if it can show that it engaged in good faith efforts to comply with

22   discrimination laws."  Defendant's Motion for New Trial at 16:18-20.  Evidence of curative or

23   remedial measures are relevant to the defense of good faith, including actions taken after

24   complaints of discrimination.  See Swinton v. Potomac Corp., 270 F.3d 794, 815 (9th Cir. 2001).

25   In *Swinton*, the Ninth Circuit explained that recent Supreme Court precedent established that

26   employers should be encouraged to institute anti-harassment measures, and must be given the

27

28                                                    21

opportunity to present evidence of such efforts.  See id.  Furthermore, employers should be given the opportunity to present evidence that shows remedial measures, whether the measures took place before or after plaintiff complained of discrimination.  See id.  Also, where a party seeks punitive damages to "deter" future conduct, the jury must be allowed to consider whether remedial actions were indeed bona fide efforts to repent and to prevent the recurrence, thus lessening the need for punitive damages.  See id.

Defendant also argues that evidence concerning its conduct regarding the kidnapping allegations of Tamayo's son showed evidence of good faith.  In particular, Defendant argues that the evidence was relevant to rebutting Plaintiffs' allegations that Defendant acted maliciously and in reckless disregard to Tamayo's rights, ignored her complaints, and retaliated against her. The efforts were taken within two months of Tamayo's complaint of harassment.  Defendant argues that the evidence would have established that Defendant's president called the F.B.I., enlisted help from all levels of Defendant's management, and secured the return of Tamayo's son from Mexico.  This evidence does not show a reckless disregard for Tamayo's rights or the implication that she was treated like a pariah and retaliated against for complaining of harassment.  Thus, the Court's rulings "hamstrung" and prejudiced Defendant in defending against punitive damages.

*Plaintiffs' Opposition*

Plaintiffs argue that Defendant's argument is "just plain wrong."  Plaintiffs argue that the Court allowed Defendant to introduce evidence of subsequent remedial measures, but Defendant failed to do so.  The fact that Defendant failed to introduce evidence of its post-2001 acts during its case-in-chief and/or the punitive damages phase is not the fault of the Court.

With respect to the "kidnapping" evidence, that evidence was properly excluded by the Court under Rule 403.  However, Plaintiffs argue that the Court did say it would be willing to reconsider its ruling.  That Defendant did not revisit the issue is not the fault of the Court.

*Defendant's Reply*

Defendant replies that Plaintiffs ignore the Court's ruling on Plaintiffs' motions in limine that prevented Defendant from offering mitigating, good faith evidence regarding subsequent policy changes.  The Court granted Plaintiffs' motion in limine "with respect to post 2001 employment acts by defendant."  This ruling prevented Defendant from introducing this evidence in its case in chief.  Although the Court's order did purport to allow acts of remediation, "to the extent relevant on the liability phase," the Court made clear that the liability phase was defined as the term of Ms. Tamayo's employment.  Thus, post-2001 acts of remediation were disallowed during phase I of the trial.  Furthermore, it is no answer that the evidence could have been introduced during the punitive damages phase because by that time, it was too late as the jury had already decided the critical question of malice for which good faith evidence was relevant and necessary.  Defendant argues that, at the time, it had been precluded from introducing evidence of its current policies and practices, which may have impacted the jury's determination of whether Defendant was malicious or recklessly indifferent.

*Discussion*

1.      Post March 2001 Remedial Conduct

The issue of post-2001 employment decisions/conduct was raised in Plaintiffs' Motion in Limine No. 1.  Plaintiffs argued that the April 2001 seminar and the 2003 employee handbook (in both English and Spanish) were irrelevant because that information was not available to Tamayo at any of the relevant periods of time, nor were these materials intended to guide Harris Farms's response to the harassment of Tamayo.  See Williams v. City of Kansas City, 223 F.3d 749, 754-55 (8th Cir. 2000).  Defendant argued then, as it does now, that evidence of corrective conduct or policies is relevant to show good faith in response to punitive damages, especially when plaintiffs seek damages to "deter" future discrimination as juries must be able to consider corrective measures to prevent a recurrence.  See Swinton, 270 F.3d at 815-16.

During the hearing on the motion, Defense counsel argued, "we're talking about whether Harris Farms is in good faith and how much – how much they should be punished, if, in fact, the

23

case – if, in fact, liability is found, this would go to the issue of good faith and the appropriate

measure of any punitive damages or lack thereof."  November 22, 2004, Transcript of Hearing on

Motions In Limine at 10:12-17.  Defense counsel again emphasized the "good faith" and amount

of punitive damages issue to the court.  See id. at 11:24-12:1.  The Court responded:

> And I don't disagree.  As I indicated, I intend to bifurcate the issue of the amount.
> The jury would find whether or not liability exists for punitive damages, but in
> terms of the amount, both financial condition and perhaps corrective or remedial
> measures taken that go solely to the issue of the amount of punitive damages
> would be tried during that phase.  And that would be a factual question that then
> could be raised to the jury.

Id. at 12:1-9.

Ultimately, the Court ruled:

> Okay.  So what I'm going to do, as to plaintiff's motion in limine, I am going to
> grant the motion with respect to post 2001 employment acts by defendant.
> However, defense would be entitled to admit, to the extent relevant on the liability
> phase, any acts of remediation.  Now, I will say this.  The bulk of that, however,
> should probably – will come in on the punitive damages phase, if we get to that
> phase, and also to the injunctive relief phase if we get to that phase.  So it's
> probably going to be fairly limited.

Id. at 13:21-14:4.

This ruling does not prohibit the introduction of evidence and is in line with the Ninth

Circuit case of Swinton.  Under Swinton, "a district court may, in its discretion, allow a

defendant/employer to introduce evidence of remedial conduct undertaken in response to its

discovery of discrimination as a means to mitigate punitive damages.  Likewise, where the

plaintiff, in arguing for punitive damages, contends that they are necessary to 'teach the

defendant a lesson,' post-charge remediation may be relevant to defendant's posture."  Swinton,

270 F.3d at 814-15 (emphasis added).  The Court's ruling was consistent with Swinton and did

not prevent Defendant from arguing "good faith" or remediation as a way to mitigate punitive

damages.  However, given the bifurcation utilized in this case, mitigation would go to the amount

of punitive damages assessed and not to liability.[7]  To "mitigate" means to avoid or reduce or

---

[7]This is also consistent with Defendant's argument at the hearing.  See Transcript of November 22, 2004,
Hearing on Motions in Limine at 10-12.

make less severe or intense.  See Black's Law Dictionary 8th Ed. at 1023; Ninth Circuit Model

Civil Jury Instruction 7.3.  None of the Court's rulings in limine prevented Defendant from

introducing evidence of the April 2001 seminar or the 2003 handbooks during the punitive

damages phase to show that deterrence was unnecessary or that very little, if any, money needed

to be awarded.  That Defendant did not utilize this opportunity to introduce the evidence is not

the fault of the Court.[8]

      2.    Evidence of Kidnapping

Plaintiffs' motion in limine no. 2 sought to preclude evidence concerning the conduct of

Defendant in assisting in the search for Tamayo's son, Hector Tamayo, whom she believed had

been kidnapped, possibly by Rodriguez.  Defendant argued that Tamayo reported her fears and

concerns about her son and Rodriguez to Harris Farms.  Harris Farms immediately investigated

and took steps to contact the FBI. It soon discovered, however, that Tamayo's son had merely ran

away.  Defendant remained in contact with local law enforcement to assist locating Hector.

Defendant's investigation confirmed that Rodriguez had nothing to do with the incident.

Defendant argued that this information is relevant in support of their *Faragher/Ellerth* defense

because an employer's prompt remedial action in response to a complaint is a defense to

allegations of sexual harassment.

Plaintiffs responded that Defendant was misrepresenting the facts.  The deposition

testimony of John Harris, who was personally involved with this incident, and Defendant's

personnel director, both testified that no one associated Tamayo's kidnaping complaint with her

sexual harassment complaint.  Furthermore, the evidence does not show that Tamayo told

Defendant that she believed Rodriguez was involved.  Thus, there was nothing to suggest that

---

[8]It is noteworthy that *Swinton* did not create a blanket rule regarding post-complaint/post-lawsuit remedial actions by an employer and left open the possibility that remedial actions may be too remote to be admissible.  See Swinton, 270 F.3d at 815-16.  In fact, the *Swinton* court upheld the lower court's decision to prevent the introduction of evidence that managers underwent harassment training in 1997, which was seven months after Swinton quit, and five months after Swinton filed his discrimination claim.  See id. at 816.  Here, the additional training took place in April 2001 and the new handbook was issued in 2003; Tamayo reported harassing conduct in both 1999 and 2001 and was constructively discharged in March 2001.

1  Defendant viewed the kidnaping incident as part of the sexual harassment complaint.

2      The Court took the motion in limine under submission and required Defendant to show

3  that it associated the kidnapping complaint with the sexual harassment and retaliation complaint.

4  See November 22, 2004, Transcript of Motions In Limine Hearing 18:9-25.  The Court

5  essentially requested an offer of proof that would link the kidnapping with Tamayo's Title VII

6  claims, otherwise the evidence would not be admitted.  See id.  However, the Court did state:

7  "Now, if you review that and you say, you know, there really isn't information that we have

8  available, but we think we might be able to develop it at trial and the Court goes ahead and grants

9  the motion, but we want the right to move to reconsider if we can get the information during the

10 course of the trial; I don't have a problem with that."  Id. at 19:16-20.  Nevertheless, the only

11 evidence presented on the issue showed that neither Defendant's president nor its human

12 resources personnel associated the kidnapping with sexual harassment.  See Depo. John Harris at

13 p. 108:8-16; Depo. Shirley Ollech at p.241:25 - 242:4.

14     Essentially, there was no evidence linking the "kidnapping" of Hector Tamayo to Olivia

15 Tamayo's complaints of sexual harassment.  If Plaintiffs had made arguments that Defendant was

16 wholly unresponsive to all employee complaints, this evidence would have had more relevance.

17 As it stands, the "kidnapping" episode is simply another occurrence that is unrelated to sexual

18 harassment or good faith.  In fact, if the officers and personnel of Defendant did not link the

19 "kidnapping" with sexual harassment complaints, then it is difficult to see why the Court or a

20 jury should see the link.  It has little or no relevance to Defendant's efforts to prevent and cure

21 sexual harassment, i.e. to comply with Title VII, and whatever relevance the evidence may have

22 is substantially outweighed by the danger of confusion.  The kidnapping episode is simply an

23 extraneous event that had little if anything to do with sexual harassment.  With respect to the

24 issues in this case, the evidence was inadmissible under Rules of Evidence 401 and 403.

25     This ground for new trial, the prohibition by the Court against post-March 2001

26 remediation and the "kidnapping," is denied.

27

28                                          26

1        **B.        Finding of "Malice" Against the Great Weight of the Evidence**

2        Defendant argues that there was little or no legally sufficient evidence that Defendant's

3    conduct was malicious or in reckless disregard of Tamayo's rights.  The undisputed evidence

4    showed that, if Tamayo was harassed, Defendant did not know about it until 1999.  The evidence

5    also showed that, when she reported harassment, Defendant took action immediately to remove

6    Rodriguez from the workplace and ultimately transferred him to another area.  Also, because the

7    complaint of harassment could have involved criminal activity, the Fresno County Sheriff's

8    office was contacted.  When Tamayo amended her complaint three weeks after making the initial

9    complaint to include allegations of rape, Defendant investigated the allegations.  Finally, two

10   years later when Tamayo complained of co-worker harassment, Defendant immediately

11   investigated and disciplined those involved.

12       Defendant also argues that there was substantial evidence of good faith.  Defendant

13   helped Tamayo obtain a restraining order.  Defendant also acted promptly and effectively with

14   regard to Maria Martinez.  Defendant also had a policy against discrimination and regularly

15   trained both supervisors and employees on prohibited conduct.  Defendant also disseminated the

16   policy in a variety of ways.  The only evidence of malicious conduct was by Rene Rodriguez and

17   that cannot be imputed to Defendant because his conduct was contrary to the good faith efforts of

18   Defendant to comply with Title VII.  See Kolstad v. American Dental Assoc'n, 527 U.S. 526,

19   539-40 (1999).

20       Because there was no evidence or insufficient evidence of malice or reckless indifference

21   by Defendant, there is insufficient evidence to support an award of punitive damages.

22       *Discussion*

23       Rule 59(a) provides in part that: "[A] new trial may be granted to all or any of the parties

24   and on all or part of the issues (1) in an action in which there has been a trial by jury, for any of

25   the reasons for which new trials have heretofore been granted in actions at law in the courts of

26   the United States."  Fed. R. Civ. Pro. 59(a).  A district court's denial of a motion for a new trial

27

28                                          27

or to amend a judgment pursuant to Rule 59 is reviewed for an abuse of discretion.  Far Out Productions, Inc. v. Oskar, 247 F.3d 986, 992 (9th Cir. 2001); Defenders of Wildlife v. Bernal, 204 F.3d 920, 928-29 (9th Cir. 2000).  A district court abuses its discretion when it bases its decision on an erroneous view of the law or a clearly erroneous assessment of the facts. Coughlin v. Tailhook Ass'n, 112 F.3d 1052, 1055 (9th  Cir. 1997).

Rule 59 gives the trial judge the power to prevent what he considers to be a miscarriage of justice.  See Moist Cold Refrigerator Co. v. Lou Johnson Co., 249 F.2d 246 (9th Cir. 1957). As such, a trial judge may grant a new trial if "the verdict is contrary to the clear weight of the evidence, or is based upon evidence which is false, or to prevent, in the sound discretion of the trial court, a miscarriage of justice."  Hangarter v. Provident Life & Accident Ins. Co., 373 F.3d 978, 1005 (9th Cir. 2004); United States v. 4.0 Acres of Land, 175 F.3d 1133, 1139 (9th Cir.1999); Roy v. Volkswagen of America, Inc., 896 F.2d 1174, 1176 (9th Cir.1990); Air-Sea Forwarders, Inc. v. Air Asia Co., Ltd., 880 F.2d 176, 190 (9th Cir. 1989).   The burden rests on the party seeking the new trial to show prejudicial error.  See Malhiot v. Southern California Retail Clerks Union, 735 F.2d 1133, 137 (9th Cir.1984); Corder v. Gates, 688 F.Supp. 1418, 1424 (C.D. Cal. 1988).

In considering a motion for a new trial, the court may weigh the evidence and assess the credibility of witnesses, and the court need not view the evidence in the light most favorable to the prevailing party.  See Air-Sea Forwarders, 880 F.2d at 190.  However, it is not enough that the trial judge would have reached a different verdict from the jury.  See 4.0 Acres, 175 F.3d at 1139;  Roy, 896 F.2d at 1176.  As explained in Landes, after weighing the evidence, the trial judge faces a difficult task:

> It may be doubted whether there is any verbal formula that will be of much use to trial courts in passing on motions [for a new trial on the grounds that the verdict is against the clear weight of the evidence].  Necessarily all such formulations are couched in broad and general terms that furnish no unerring litmus for a particular case.  On the one hand, the trial judge does not sit to approve miscarriages of justice.  His power to set aside the verdict is supported by clear precedent at common law and, far from being a denigration or a usurpation of jury trial, has long been regarded as an integral part of trial by jury as we know it.  On the other

hand, a decent respect for the collective wisdom of the jury, and for the function entrusted to it in our system, certainly suggests that in most cases the judge should accept the findings of the jury, regardless of his own doubts in the matter. Probably all that the judge can do is to balance these conflicting principles in the light of the facts of the particular case. *If, having given full respect to the jury's findings, the judge on the entire evidence is left with the definite and firm conviction that a mistake has been committed, it is to be expected that he will grant a new trial.*

Landes Const. Co., Inc. v. Royal Bank of Canada, 833 F.2d 1365, 1371-72 (9th Cir. 1987) (internal cites and quotations omitted) (emphasis added).  "Doubts about the correctness of the verdict are not sufficient grounds for a new trial:  the trial court must have a firm conviction that the jury has made a mistake."  Landes Const., 833 F.2d at 1372.

Punitive damages are appropriate when a "defendant's conduct was malicious or in reckless disregard of the plaintiff's rights."  See Ninth Circuit Model Jury Instruction § 7.5 – Punitive Damages.[9]  Conduct is considered malicious if it is "accompanied by ill will, or spite, or if it is for the purpose of injuring another."  Id.  Conduct is considered to be in reckless disregard of a plaintiff's rights "if, under the circumstances, it reflects complete indifference to the plaintiff's safety, rights, or the defendant acts in the face of a perceived risk that its actions will violate the plaintiff's rights under federal law."  Id.  In order to impose punitive damages against a corporation for violations of Title VII, a plaintiff must: (1) prove that the employer engaged in a discriminatory practice with malice or a reckless indifference to the federally protected rights of an aggrieved individual; (2) prove that liability is properly imputed to the employer; and (3) defeat the employer's affirmative defense (if asserted) that it made good faith efforts to comply with Title VII.  Kolstad, 527 U.S. at 534-35; Hemmings v. Tidyman's, Inc., 285 F.3d 1174, 1197-99 (9th Cir. 2002).  "The terms 'malice' or 'reckless indifference' pertain to the defendant's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination."  Kolstad, 527 U.S. at 535.  Thus, the pertinent question for the first prong is whether the defendant "acted in the face of a perceived risk that its actions will

---

[9]This instruction is found at:
http://www.ce9.uscourts.gov/web/sdocuments.nsf/civ?OpenView&Start=1&Count=250&Expand=9#9

violate federal law." Id. at 536; Hemmings, 285 F.3d at 1197.  Evidence of retaliation, lying about actions taken as part of a scheme to cover up harassment, intentional conduct, or conduct performed with knowledge of anti-discrimination principles or policies may also fulfill the first prong.  See Hemmings, 285 F.3d at 1198-99 (and cases cited therein); Passantino v. Johnson & Johnson Consumer, 212 F.3d 493, 515-16 (9th Cir. 2000).  To impute liability to the employer under the second prong, the plaintiff must show that the discrimination by an employee is attributable to the employer by using traditional agency principles, for example, that a managerial employee acted within the scope of his or her employment.  Kolstad, 527 U.S. at 540-41; Hemmings, 285 F.3d at 1198.  Finally, good faith efforts to comply with Title VII through anti-discrimination policies are insufficient if the policies are not enforced or are ineffective.  See Bains LLC v. Arco Prods. Co., 405 F.3d 764, 774 (9th Cir. 2005); Costa v. Desert Palace, Inc., 299 F.3d 838, 864 (9th Cir. 2002).  The good faith affirmative defense is also not available where the improper conduct is committed by agents of the corporation who are sufficiently senior so as to be considered proxies for the corporation.  See Hemmings, 285 F.3d at 1198.

         As applied to this case, there is sufficient evidence to support the award of punitive damages.  First, although evidence was presented that Defendant had a written policy against sexual harassment, the provisions of the policy were out of date.  For example, the policy did not describe conduct that could constitute sexual harassment or have an anti-retaliation provision. From 1989 until 2001, the same policy, without any updates, was in force and distributed to Defendant's employees.  Despite testimony from Erick Johnson (former executive vice president) and John Harris (president) that they knew that the policy was out of date, no revisions or up-dates of Defendant's policy were printed or distributed.[10]

         Second, when Tamayo made complaints, negative evidence was introduced concerning the investigations.  Evidence was presented that the translations of reports or interviews

---

[10]Although Defendant presented evidence that it distributed sexual harassment bulletins and conducted informal "tailgate" meetings, Plaintiffs presented testimony from former Harris Farms's employees who refuted this.

involving Tamayo were inaccurate.  In particular, the summary in Spanish of the August 18, 1999, meeting where Tamayo reported the rapes was partly translated by the court interpreter before the jury, and the official interpretation was nonsensical.  This was a document that Tamayo understandably refused to sign/adopt as an accurate reflection of the meeting and her complaints.  Additionally, Tamayo had suspicions that the contemporaneous translations to Deputy Crittenden were inaccurate.  The inaccuracy of the August 18, 1999, translation and Tamayo's own concerns about translation cast doubts on the translating involved during Defendant's investigation.

Also, evidence was presented that after the conclusion of Tamayo's first complaint against Rodriguez (for grabbing her arm and harassing her), Tamayo was assigned to work in a field near Rodriguez's home.  Although Tamayo's supervisor, Raul Enriquez, admitted that he assigned Tamayo to work in the field near Rodrgiuez's home, he was not told by human resources that Tamayo had filed a complaint against Rodriguez or that the two should be kept apart.  Similarly, when Tamayo reported Rodriguez's truck driving slowly back and forth near the field where she was working and that she was afraid, no further formal action appears to have been taken.

On August 18, 1999, two days after the "drive by" incident, evidence was presented that Tamayo reported to Defendant's human resources department that Rodriguez had raped her on three occasions.  Although Defendant had called Deputy Sheriff Crittenden to investigate the "grabbing incident" involving Rodriguez, Crittenden was not contacted about the rapes.[11]  Moreover, Rodriguez was not interviewed regarding the rapes until September 29, 1999, approximately six weeks after Tamayo reported the rapes.  During this six week period, Tamayo filed a complaint with the EEOC on September 24, 1999.  Despite the seriousness of the allegations, no further discipline was taken against Rodriguez and no final report or findings

---

[11]Also, Crittenden did not speak Spanish and relied on Defendant's employee Sylvia Gomez to translate. During the interview, Gomez handed Crittenden a note indicating that Rodriguez and Tamayo had an affair.

were made by Defendant/the human resources department.  Instead, the status quo remained and Rodriguez retired in December 1999.

Also, testimony was presented that between 1999 and 2001, rumors regarding Tamayo and Rodriguez were being spread.  The rumors evolved into threats of violence, specifically that Rodriguez was willing to pay $2,000 to have Tamayo drugged and then have pictures made of her having sex.  The pictures would then be sent to Tamayo's husband in order to break up her marriage.  Additionally, rumors/gossip was spread that Tamayo preferred to be on top of men during sex.  Tamayo became afraid for her safety and tired of the constant rumors and complained of the gossip twice in late January 2001 to her immediate supervisors.  On February 2, 2001, Tamayo went to the office and told the human resources director, Sylvia Gomez,[12] about the rumors, said that employees Hernandez, Mendoza, and Mosqueda were spreading the rumors, said that she was scared, and requested not to work alone.  The following day Tamayo returned to the office and was informed that her request to be transferred to a job where she would not work alone was denied.  Tamayo then requested that she and two witnesses to the gossip/rumors (Gustavo and Lourdes Ramirez) speak with Larry Chrisco, the farm manager.  Despite the violent nature of the rumors and Tamayo's fears, Tamayo and her witnesses did not meet with Chrisco until approximately three weeks later on February 21, 2001.  At the meeting with Chrisco, the gossip and rumors were related to Chrisco by both Tamayo and her witnesses.  Additionally, the Ramirezes told Chrisco that their work vehicles had been vandalized prior to the meeting.  Specifically that the tires of Gustavo's truck had been slashed and hydraulic lines on Lourdes' vehicle had been cut.

Gomez began an investigation that eventually ended on March 12, 2001.  Gomez concluded that there were two groups involved in the rumors, one group consisting of Tamayo and the Ramirezes and a second group consisting of Hernandez, Mendoza, and Mosqueda.  All

---

[12]In the interim between Tamayo's 1999 and 2001, Sylvia Gomez was internally promoted to Defendant's human resources director.

involved in the gossip/rumors were disciplined, including Tamayo and the Ramirezes.  Tamayo
was suspended for one day without pay and given a final written warning that engaging in
sexually inappropriate behavior at the work place would lead to termination.  Chrisco had
recommended that everyone involved be suspended without pay for two weeks.  Gomez
concluded that Tamayo had participated in the gossip and made sexually inappropriate
comments, but no specific evidence was introduced to support this conclusion.  When Gomez
told Tamayo that she was going to be disciplined, Gomez also refused to answer Tamayo's
questions about what would happen to the other workers involved.  Three of the workers
involved, Lourdes Ramirez (one of Tamayo's witnesses), Mendoza, and Mosqueda were
terminated because of prior warnings.  Even though Tamayo was the one who complained about
the gossip against her and sought help, and despite the prior histories of inappropriate gossip and
harassment by Mendoza and Mosqueda, Gomez and Defendant's management reached the
conclusion that Tamayo had engaged in inappropriate sexual communications/conduct and that
discipline was appropriate.

Taken as a whole, the above evidence is sufficient to support a finding that Defendant
acted with reckless disregard to Tamayo's rights.  The evidence of the failure to transfer jobs,
suspension, and a final written warning is sufficient to support the jury's finding of retaliation,
which can support an award of punitive damages.  See Hemmings, 285 F.3d at 1198-99 (and
cases cited therein); Passantino, 212 F.3d at 515-16.  The fact that Defendant maintained the
same written sexual harassment policy for 12 years with no up-dates or modifications, despite
knowing that changes in the law occurred, indicates reckless disregard for rights.  Additionally,
the out-of-date written policy, the amount of time to investigate complaints (particularly the rape
allegation and the 2001 gossip allegation), the conclusion of the 2001 gossip complaint, the non-
conclusion reached with respect to the rape allegations, and the translation problems point to an
ineffective sexual harassment policy.  See Bains LLC, 405 F.3d at 774 (noting that a sexual
harassment policy must be enforced); Costa, 299 F.3d at 864 (noting that a sexual harassment

policy must be effective).  Finally, the investigations of the 1999 complaints were performed by Defendant's human resources agents and the investigation and retaliatory conduct regarding the 2001 complaint were performed and approved by Defendant's human resources personnel and management.  See Hemmings, 285 F.3d at 1198.

It is true that Defendant had a written policy against harassment and some evidence indicated that pamphlets were handed out, tailgate meetings touching on harassment were conducted, and a harassment seminar in 1996 was also conducted.  There is also evidence, as Defendant argues, that it investigated Tamayo's claims.  However, it took approximately six weeks for Defendant to investigate the more serious 1999 allegations of rape and approximately six to seven weeks to resolve Tamayo's complaints about the gossip and rumors, despite Tamayo's fears and the violent nature of the rumors.  Similarly, Defendant also refused her request to not be required to work alone.  Furthermore, although Defendant initially helped Tamayo in the process of obtaining a temporary restraining order, testimony indicated that she was abandoned by Defendant and was forced to find her own attorney.  Finally, although Deputy Crittenden was called to investigate Tamayo's first formal complaint about Rodriguez, Crittenden was passed a note indicating that there were rumors of an affair.  Furthermore, the Deputy was not contacted when the allegations of rape surfaced.

It is not enough that the trial judge may have reached a different verdict from the jury or that a court may have doubts about the correctness of the verdict, rather the trial court must have a firm conviction that the jury has made a mistake.  See 4.0 Acres, 175 F.3d at 1139; Landes Const., 833 F.2d at 1372.  Having given full respect to the jury's findings, and having reviewed the evidence and arguments of the parties, and having observed the witnesses during trial, the Court cannot say that it is "left with the definite and firm conviction that a mistake has been committed."  Landes Const., 833 F.2d at 1372.  The jury's verdict on punitive is not against the clear weight of the evidence.

34

### III.    IMPROPER JURY INSTRUCTION ON RETALIATION

Defendant argues that it is entitled to a new trial based on an erroneous instruction and/or lack of limiting instruction on Plaintiff's retaliation claim.  From the beginning of litigation, Defendant argues that Plaintiffs pursued two theories of retaliation, one based on Tamayo's 1999 complaint and another based on Tamayo's 2001 complaint.  Plaintiffs abandoned the 1999 complaint, which was allegedly based on Tamayo's being stationed close to Rodriguez's residence.  Despite being abandoned, Defendant argues that the Court's instruction failed to instruct the jury that the retaliation claims were limited to the alleged incidents of 2001.  The improper instruction/lack of limiting instruction tainted the verdict and constituted error.

*Plaintiffs' Opposition*

Plaintiffs argue that Federal Rule of Civil Procedure 51 requires jury instruction errors to be raised in a timely manner in order to prevent "sandbagging."  See Zhang v. American Gem Seafoods, Inc., 339 F.3d 1020 (9th Cir. 2003).  Defendant is alleging error because the Court did not instruct the jury that the retaliation claims were limited to the alleged incidents of 2001.  However, Defendant failed to object to the instruction and waived error.  Also, Plaintiffs proposed a retaliation instruction that described conduct as "adverse actions" that occurred exclusively in 2001.  Plaintiffs have never advanced a theory that Tamayo's "isolation and placement in a field near Rodriguez's home [in 1999] constituted retaliation."  Plaintiffs' 1999 retaliation complaint concerned only a demotion.  In closing argument, counsel for Tamayo and the EEOC argued that conduct that occurred only in 2001 constituted retaliation.

*Defendant's Reply*

Defendant argues that, for the same reasons explained concerning a lack of objection or the failure to request a limiting instruction, its failure to object to the retaliation instruction is was not waived.  Essentially, while Rule 51 normally requires an objection to preserve error, where the court is "aware of the party's concern with an instruction, and further objection would be unavailing, we will not require a futile formal objection."  Gulliford, 136 F.3d at 1348.

Defendant argues by implication that the Court was aware of its concerns regarding retaliation and further objection or comment by Defendant would have been futile.

*Discussion*

Defendant does not challenge or contest the assertion that it failed to object that the given retaliation instruction did not distinguish between 1999 conduct and 2001 conduct.  The only retaliation instruction requested by Defendant was the instruction found in the Ninth Circuit Model Instructions and that was given by the Court with slight modification.  At no time did Defendant object or request a temporal limit on the retaliation instruction.  In fact, with respect to a limit on conduct occurring in 1999 and conduct occurring in 2001, Defendant's proposed instruction is identical to the instruction given by the Court.  Cf. Docket No. 234 at p.20 with Defendant's Proposed Instruction No. 45.  Defendant nowhere explains how the Court was aware of Defendant's concerns regarding the retaliation instruction and fails to explain why bringing this concern to the attention of the court would have been futile.  Defendant has failed to establish the exception to Rule 51's requirement of an objection before the jury retires.  See Monroe, 248 F.3d at 858-859; Gulliford, 136 F.3d at 1348.  Defendant has waived any objection to the retaliation instruction based on a failure to limit the instruction to 2001 events.  See Fed. R. Civ. Pro. 51; Larez, 946 F.2d at 638.  This ground for new trial is denied.


**IV.   JURY'S DAMAGES AWARD NOT SUBJECT TO PROPER DETERMINATION UNDER STATUTORY DAMAGES CAP**

*Defendant's Argument*

Defendant argues that Title VII damages are capped at $300,000 where defendant employer has 500 or more employees.  See 42 U.S.C. § 1981a(b)(3)(D).  The cap includes compensatory damages for pecuniary loss, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, other nonpecuniary losses, and punitive damages.  See id.  The statute does not define "future pecuniary loss," but lost wages and benefits, or "front pay," is excluded from the cap.  See Pollard v. E.I. du Pont de Nemours & Co., 532 U.S. 843 (2001).

1    Thus, "future pecuniary loss" and lost wages and benefits are separate and distinct elements.

2    Here, the jury was asked to determine the amount of "future economic loss, including lost

3    wages/benefits."  The instruction loses the distinction between "future pecuniary loss" and lost

4    wages and benefits.  The jury awarded $91,000 for this category of damages.  However, it is not

5    possible to determine what portion of the award was attributed to future economic loss and what

6    portion was attributed to lost wages and benefits.  Because the damages are not segregated, a new

7    trial is necessary.  See Coastal Abstract Service, Inc. v. First American Title Ins. Co., 173 F.3d

8    725, 733 (9th Cir. 1999).

9            *Plaintiffs' Opposition*

10           Plaintiffs opposition is three-fold.  First, Plaintiffs argue that $91,000 was awarded under

11   both Federal and California.  Since California does not have a damages cap, the Court should

12   allocate the full $91,000.00 to compensation for state law claims as authorized by *Passantino v.*

13   *Johnson & Johnson Consumer Products*, 212 F.3d 493, 510 (9th Cir. 2000).  Alternatively,

14   Plaintiffs argue that Defendant did not object on the basis of ambiguity concerning future

15   economic damages and thus waived the objection.  See Eastern Mountain Platform Tennis, Inc.

16   v. Sherwin-Williams Co., Inc., 40 F.3d 492 (1st Cir. 1994).  Finally, apportionment for cap

17   purposes is possible because during both a "meet and confer" session and during closing

18   arguments before the jury, Tamayo's counsel made it clear that she sought recovery for future

19   lost earnings.[13]

20           *Discussion*

21           This issue can be resolved by allocating the full $91,000 to the state law claims.

22   Defendant makes no counter argument and indeed does not even respond to this solution.  The

23   verdict form contains a damages section for both the Federal and State law claims.  Under

24   Paragraph 15 (federal claims) and Paragraph 19 (state claims), the jury wrote $91,000.  To avoid

25

26

27           [13]Defendant makes no reply to these arguments.

1   any ambiguities and cap confusion, the entire $91,000 may be allocated to FEHA claims.[14]   See

2   Passantino, 212 F.3d at 509-10; see also Order on Defendant's Motion to Amend Judgment.

3   This ground for new trial is denied.

4

5                                **CONCLUSION**

6         With respect to evidence concerning Guardado, Ortiz, and Martinez, Defendant did not

7   raise its concerns over Rule 404(b), and does not appear to have objected to any of that

8   testimony.  With respect to Hermila and Mattias Barrera, Defendant's motion to strike was filed

9   over a month after they testified.  This is clearly not a contemporaneous or timely objection as

10  required by Rule 103.  However, the Barrera's testimony was relevant to show state of

11

12        [14]In relevant part, *Passantino* states:

13
          The district court allocated all of the compensatory damages, front pay, and backpay to
14        Passantino's state law claim, while allocating the punitive damages to her Title VII claim. CPI
          contends that the entire award (apart from backpay) should have been subject to the $ 300,000
15        Title VII damages cap.
          . . . . .
16        As the verdict form indicates, the jury found for Passantino on both federal and state law
          retaliation claims, and awarded damages without specifying any particular allocation. Thus, the
17        most reasonable assumption is that the jury awarded the same damages on both the federal and
          state claims. The damages were duplicative, however, because the two claims were essentially the
18        same; they involved the same conduct and were evaluated under the same legal standard. In the
          absence of a contrary directive, such as a statutory mandate that damages be allocated to one claim
19        rather than another, the district court had authority to allocate the damages to either claim. Faced
          with the general verdict, the district court chose to allocate the award to the state rather than the
20        federal claim. As the jury had awarded damages without differentiating between the claims, the
          awards were effectively fungible, and the district court's action was entirely within its discretion
21        and consistent with the jury's verdict.
          . . . . . .
22
          Moreover, CPI's proposed allocation would conflict with the district court's general obligation to
23        preserve lawful jury awards when possible. The jury's entire compensatory damage award was
          lawful under state law, and its punitive damage award was lawful under federal law (subject to any
24        constitutionally valid limitation imposed by the statutory cap). An allocation that would serve to
          reduce lawfully awarded damages would fail to respect the jury's verdict and conflict with the
25        purpose and intent of one or both statutes. Thus, we hold that the district court's allocation decision
          was not an abuse of discretion, and furthermore that, in circumstances such as these, subjecting the
26        whole damage award to Title VII's cap would be inconsistent with Title VII's provisions.
          Passantino, 212 F.3d at 509-10.

27

28                                      38

mind/explain Tamayo's conduct in not coming forward sooner and to show a hostile environment. It was not too remote because Rodriguez utilized it in his harassment of Tamayo, primarily to keep Tamayo in fear. Although it would otherwise have been too remote, Rodriguez's use of the events against Tamayo in aide of his harassment made the evidence relevant and current. It is similar to what happened to Tamayo in that it showed Rodriguez was willing to fight husbands for their wives. Finally, given the issues in this case, the Barreras' testimony was very probative and was not substantially outweighed by its potential for unfair prejudice under 403. Defendant argues that objections and/or requests of instructions would have been futile given the Court's rulings. Defendant, however, does not adequately explain why objections would have been futile. In fact, Defendant's motion in limine on this issue was granted, the Court indicated it would reconsider any of its in limine rulings, and indicated its willingness to give limiting instructions if provided by the parties. Such conduct by the Court does not create a harbor for Defendant; although Defendant is not required to do a futile thing, it has not shown that an objection and/or request for a limiting instruction would have been futile.

With respect to punitive damages, Defendant did not try to introduce evidence concerning its post-March 2001 employment practices. Given the ruling of the Court in limine, Defendant could have presented such evidence during the punitive damages phase as a defense in mitigation as provided by *Swinton*. Moreover, Defendant was free to ask for reconsideration of the motion in limine. The fact that Defendant did not attempt to introduce the evidence at any point or request reconsideration does not equate to error by the Court. Defendant could have presented the evidence as a means of mitigating punitive damages. With respect to evidence of kidnapping, that evidence was, and remains, irrelevant as a defense to sexual harassment allegations. Punitive damages were awarded against Defendant because of its conduct concerning sexual harassment, not because of a general lack of responsiveness to employee problems. Defendant was not able to establish a link between the sexual harassment complaint/investigation and the kidnapping. In fact, the only evidence introduced on the issue, even after the Court gave

Defendant a second chance to lay an appropriate foundation, showed that officers and personnel did not link the kidnapping with Tamayo's complaint of sexual harassment.  Evidence of the kidnapping would have been unduly confusing and had little, if any, relevance to the issues in this case.

Defendant's argument that the award of punitive damages has legally insufficient support is not persuasive.  Evidence was presented that showed, *inter alia*, retaliation, an out of date written harassment policy, and untimely/lengthy response times to Tamayo's rape and gossip/rumors complaints.  It is not enough that the trial judge may have reached a different verdict from the jury or that a court may have doubts about the correctness of the verdict, rather the trial court must have a firm conviction that the jury has made a mistake.  After giving full respect to the jury's findings, and having reviewed the evidence and arguments of the parties, and having observed the witnesses during trial, the Court cannot say that it is left with the definite and firm conviction that a mistake has been committed.

With respect to Defendant's allegation of an erroneous instruction regarding retaliation, Defendant did not object to the instruction given by the Court.  In fact, with respect to distinguishing 1999 conduct from 2001 conduct, the given instruction is identical to Defendant's proposed instruction (which was simply the Ninth Circuit Model).  Defendant argues that no objection was necessary, but Defendant fails to show why an objection would have been futile.  Defendant has waived any error concerning distinguishing between the 1999 and the 2001 conduct.

Finally, with respect to the jury award for future damages, Defendant does not attempt to reply to Plaintiffs' argument that the entire amount can be allotted to the state FEHA claim.  To avoid any confusion, allotting the entirety of the $91,000 to the FEHA claim is appropriate under *Passantino*.  This is done in the Order on Defendant's Motion to Amend Judgment.

Accordingly, IT IS HEREBY ORDERED that Defendant's motion for new trial is

40

1  DENIED.

2  IT IS SO ORDERED.

3  **Dated:    August 25, 2005** _____           _____/s/ Anthony W. Ishii_____
   0m8i78                                UNITED STATES DISTRICT JUDGE

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28                                41