IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | ) ) ) | CIV F 02-6199 AWI LJO |
| Plaintiff, | ) ) | ORDER ON DEFENDANT'S RULE 62(c) MOTION |
| OLIVIA TAMAYO, | ) ) | |
| Plaintiff-Intervenor, | ) ) | |
| v. | ) ) | |
| HARRIS FARMS, INC., | ) ) | |
| Defendant. | ) ) | |
| _____ | ) | |

After a lengthy jury trial in which Defendant was found to have violated Title VII and the California Fair Employment and Housing Act ("FEHA") with respect to sexual harassment, retaliation, and constructive discharge, this Court granted equitable relief and imposed an injunction on Defendant.  Defendant then moved for a temporary stay of the injunction, which was granted, and filed this Rule 62(c) Motion to Stay Pending Appeal.  Defendant's motion will be denied.

## LEGAL STANDARD

Through Federal Rule of Civil Procedure 62(c), a district court "retains jurisdiction during the pendency of an appeal to act to preserve the status quo."  Natural Resources Defense Council, Inc. v. Southwest Marine, Inc., 242 F.3d 1163, 1166 (9th Cir. 2001).  "Rule 62(c) does

not restore jurisdiction to the district court to adjudicate anew the merits of the case," and the "district court's exercise of jurisdiction should not materially alter the status of the case on appeal." Mayweathers v. Newland, 258 F.3d 930, 935 (9th Cir. 2001); Southwest Marine, 242 F.3d at 1166.  In relevant part, Rule 62(c) reads:

> (c) Injunction Pending Appeal. When an appeal is taken from an interlocutory or final judgment granting, dissolving, or denying an injunction, the court in its discretion may suspend, modify, restore, or grant an injunction during the pendency of the appeal upon such terms as to bond or otherwise as it considers proper for the security of the rights of the adverse party. . . .

Fed. R. Civ. P. 62(c).

"A party seeking a stay of a lower court's order bears a difficult burden." United States v. Private Sanitation Indus. Ass'n of Nassau/Suffolk, Inc., 44 F.3d 1082, 1084 (2d Cir. 1994). District courts consider four factors in ruling on Rule 62(c)  motions: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." Hilton v. Braunskill, 481 U.S. 770, 776 (1987); United States v. 1020 Elect. Gambling Mach., 38 F.Supp.2d 1219, 1220 (E.D. Wash. 1999); Overstreet ex rel. NLRB v. Thomas Davis Medical Ctrs., P.C., 978 F. Supp. 1313, 1314 (D. Ariz. 1997); Texaco Ref. & Mktg. v. Davis, 819 F.Supp. 1485, 1486 (D. Or. 1993); Miller v. Carlson, 768 F.Supp. 1341, 1342 (C.D. Cal. 1991).  "This standard for evaluating the desirability of a stay pending appeal is quite similar to that which the Court employ[s] in deciding to grant [a] preliminary injunction." Miller, 768 F.Supp. at 1342 (citing Lopez v. Heckler, 713 F.2d 1432, 1435 (9th Cir. 1983)).[1]

---

[1]Relying on Gilder v. PGA Tour, Inc., 936 F.2d 417, 422 (9th Cir. 1991) and Warm Springs Dam Task Force v. Gribble, 565 F.2d 549, 551 (9th Cir. 1977), Defendant argues that a party moving for a Rule 62(c) injunction must satisfy three criteria: (1) probability of success on appeal; (2) relative hardships to the parties if the stay is or is not imposed; and (3) impact on public interest.  Defendant's Motion at 9.  However, *Gilder* involved the review of a preliminary injunction, was not a Rule 62(c) stay case, and did not cite Rule 62(c).  See Gilder, 936 F.2d at 422.  *Warm Springs Dam* involved both a denial of a preliminary injunction and a denial of a stay pending appeal, but the factors relied upon for review of the district court's orders were not inconsistent with *Hilton*, and *Warm Springs Dam* was decided before *Hilton*.  See Warm Springs Dam, 565 F.2d at 551.

2

With respect to irreparable injury, speculative injury does not constitute irreparable injury. <u>See</u> <u>Goldie's Bookstore v. Superior Ct.</u>, 739 F.2d 466, 472 (9th Cir. 1984). Rather, a plaintiff must demonstrate immediate threatened injury as a prerequisite to preliminary injunctive relief. <u>See</u> <u>Caribbean Marine Services Co. v. Baldridge</u>, 844 F.2d 668, 674 (9th Cir. 1988). In evaluating the harm that will occur depending upon whether or not the stay is granted, a court may consider: "(1) the substantiality of the injury alleged; (2) the likelihood of its occurrence; and (3) the adequacy of the proof provided." <u>Michigan Coalition of Radioactive Material Users, Inc. v.</u> <u>Griepentrog</u>, 945 F.2d 150, 153 (6th Cir. 1991).

## _____ **DISCUSSION**

Defendant's motion is based primarily on the first *Hilton* factor. Given the parties's limited discussion of the additional *Hilton* factors, the Court will examine the *Hilton* factors out of order.

### 1.   **Irreparable Harm**

There appears to be little harm in denying a stay. The injunction requires Defendant to continue its educational programs regarding sexual harassment and to maintain records of those programs. The injunction also requires Defendant to post a notice regarding this lawsuit/retaliation and to keep records of those who are disciplined regarding sexual harassment. The duties imposed by the injunction are not the type that are readily redressable through a monetary award, but the duties are not onerous. This is especially so in considering that throughout the injunction proceedings, Defendant took the position that sexual harassment is simply a non-issue with its workers and that it has eradicated the problem. <u>E.g.</u> Defendant's Opposition to Plaintiff's Motion for Injunctive Relief at 5:15-18, 6:12-15; Supplemental Opposition to Plaintiff's Motion for Injunctive Relief at 9:12. If Defendant's representations are correct, then there will be no harm to Defendant from this injunction. <u>Cf.</u> <u>Baldridge</u>, 844 F.2d at 674-76. If sexual harassment is not a problem at Defendant's facilities, then there would be

1  nothing for its employees to report and no additional records or investigations would be

2  necessary and the issue of retaliation would not arise.

3       Further, Defendant has not presented any declarations that describe the extent of any

4  harm that it will suffer.  See Griepentrog, 945 F.2d at 153.  It is Defendant's burden to show

5  harm, and no evidence has been produced to show how Defendant will be harmed.  Defendant

6  argues in general that it will be harmed or that if a reversal is obtained, then the injunction will be

7  moot.[2]  However, that is a possibility in every case involving an injunction.  Considering that the

8  nature/extent of any injury is insubstantial and that no evidence has been produced in support of a

9  specific injury, this factor does not weigh in favor of granting a stay.

10

11  **2.    Injury To Other Parties Interested In The Proceeding**

12       In its motion, Defendant did not specifically address this consideration.  In opposition, the

13  EEOC argues that this factor favors denial of a stay.  In particular, EEOC argues that in the

14  findings of fact made by the Court in conjunction with the injunction, the Court found that since

15  Sylvia Gomez still maintained her position with Defendant, there was a danger of retaliation.  The

16  Defendant argues that Plaintiff has presented no evidence that shows how third parties will be

17  injured if a stay is granted.

18       It is Defendant's burden to show that a stay is justified.  Plaintiff is correct that the Court

19  concluded that injunctive relief was appropriate and that there was a danger of retaliation

20  occurring with respect to other employees, that is, third parties.  For the reasons stated in the

21  Court's order on injunctive relief regarding retaliation to other employees, this factor does not

22  favor a stay.

23

24       ─────────────

25       [2]Defendant cites *Stop H-3 Assoc. v. Volpe*, 353 F.Supp. 14, 16 (D. Haw. 1972) for the proposition that a stay should be granted "to maintain the status quo where otherwise, absent the stay, there is a substantial likelihood that the basis for the appeal will be mooted by the operation of the injunction."  *Volpe* listed the above, as well as

26  two other rationales, as equitable principles supporting the issuance of a Rule 62(c) injunction.  However, *Volpe* went on to say that these equitable principles are implemented through application of the *Hilton* factors (*Hilton* was

27  decided after *Volpe*, but what became the *Hilton* factors are in fact listed by *Volpe*).  Id.

28                                                    4

**3.**     **The Public Interest**

Defendant simply states that there is no evidence that the a stay will have any impact on the public interest.  In opposition, the EEOC argues that it is a public/governmental agency and it represents the public interest.  Since the EEOC, in its capacity as representative of the public interest, sought the injunction, the public interest lies against granting a stay.

In actions by federal agencies, "the government's interest is in large part presumed to be the public's interest."  United States v. Rural Elec. Convenience Corp., 922 F.2d 429, 440 (7th Cir. 1991).  Further, it is apparent that preventing Title VII harassment and retaliation is in the public interest.  Given these considerations, this factor is at best neutral and does not favor a stay.

**4.**     **Strong Probability Of Success On Appeal**

Defendant argues that it is entitled to an injunction pending appeal because it has a probability of success on appeal based on three grounds: (1) this Court erred in not allowing Defendant to produce evidence of good faith conduct prior to the jury's consideration of the propriety of punitive damages; (2) this Court erred by holding Tamayo's FEHA claims were not time barred; and (3) this Court erred in admitting the testimony of Mr. and Mrs. Barrera.  Defendant argues that it will suffer irreparable injury if a stay is not granted.

**1.**     **Timeliness of FEHA Claims**

*Defendant's Argument*

Defendant argues that it raised the timeliness of Tamayo's FEHA claims in its motion to dismiss.  Defendant argued that under California Government Code § 12965(e), the tolling period for a bringing a FEHA claim expires "when the federal right-to-sue period to commence a civil action expires, or one year from the date of the right-to-sue notice by DFEH, whichever is later."  Cal. Gov't Code § 12965(e).  There is no dispute that Tamayo filed her complaint more than one year after DFEH issued its right to sue letter, thus, the timeliness of the complaint depends on the federal right to sue period.  Defendant argued that the federal right to sue period

expired after the EEOC filed suit and that 42 U.S.C. § 2000e-5(f)(1) required Tamayo to file

within 90 days of the EEOC's complaint.  However, neither side presented dispositive authority

on the issue.  This Court recognized that there was a "dearth of authority" on the issue of tolling

period expiration where the EEOC issues no letter but instead files suit, stated that it was unable

to provide a ruling on the issue, but concluded that Defendant had not shown that it was entitled

to a dismissal.  The Court's ruling on the motion to dismiss shows the need for Ninth Circuit

guidance and a stay is necessary.

> *EEOC's Opposition*

The EEOC responds that this ground is a non-issue because resolution of the FEHA

claims will have no effect on the federal claims.  Plaintiffs received favorable verdicts on both

their Title VII and FEHA claims.  Thus, even if the FEHA claims are dismissed as untimely,

injunctive relief would remain under federal law.

> *Discussion*

The EEOC's argument is well taken, and Defendant did not address this ground in their

reply brief.  Assuming *arguendo* that the Ninth Circuit will agree with Defendant on its FEHA

statute of limitations question, that will impact the damages award but will have no impact on the

injunction.  The FEHA and Title VII causes of action parallel each other and the same evidence

was used to obtain and support verdicts for sexual harassment, retaliation, and constructive

discharge under both laws.  Even if the FEHA claims are struck, each of the federal causes of

action and the evidence supporting the verdict and injunction would remain intact.  The Court

does not see how striking the FEHA claims would have any impact on the injunction.  This

ground for a stay is overruled.

> **2.    Good Faith Evidence And Punitive Damages**

> *Defendant's Argument*

Defendant argues that the Court erred in not allowing it to put on evidence of its good

faith efforts to comply with Title VII and prevent sexual harassment.  In particular, Defendant

1  argues that it should have been allowed to present evidence of its 2003 updated harassment

2  policies and evidence concerning an April 2001 sexual harassment seminar.  As stated in

3  *Swinton*, employers "should be encouraged to institute anti-harassment measures, and must be

4  given the opportunity to present evidence of such efforts."  Swinton v. Potomac Corp., 270 F.3d

5  794, 814 (9th Cir. 2001); see also Kolstad v. American Dental Ass'n, 527 U.S. 526, 545 (1999).

6  Accordingly, it was error to not allow Defendant to present its good faith evidence until after the

7  jury had already decided during the liability phase to impose punitive damages.  In assessing

8  punitive damages during the liability phase, the jury was specifically instructed that it could

9  award punitive damages to "deter a defendant and others from committing similar acts in the

10  future."  Since the jury was charged with the need to deter Defendant, Defendant should have

11  been able to present evidence of its policies.  Defendant will argue on appeal that evidence of its

12  remedial conduct was vital to the jury's decision under the facts of this case.  "That the jury

13  considered the need to prevent future conduct while being prevented from hearing of

14  [Defendant's] efforts in that regard was error.  This error would necessitate a new trial, and thus

15  would invalidate the injunctive relief."  Thus, a stay is appropriate.

16      *Plaintiff's Opposition*

17      The EEOC argues that Defendant was not prevented from offering good faith evidence.

18  During the motion in limine hearing, the Court stated that acts of remediation would be

19  admissible to the extent relevant during the liability phase, but that the bulk could come in during

20  the punitive damages phase.  That Defendant did not utilize its opportunity to admit the evidence

21  was not error by the Court.  A stay based on this ground is inappropriate.

22      *Discussion*

23      The argument that Defendant now makes is similar to the argument it made in the motion

24  for new trial.  The issue was first raised, however, in the motions in limine.  As discussed in the

25  motion for new trial, during the hearing on the motion in limine, Defense counsel argued, "we're

26  talking about whether Harris Farms is in good faith and how much – how much they should be

27

28                                     7

punished, if, in fact, the case – if, in fact, liability is found, this would go to the issue of good

faith and the appropriate measure of any punitive damages or lack thereof." November 22, 2004,

Transcript of Hearing on Motions In Limine at 10:12-17. Defense counsel again emphasized the

"good faith" and amount of punitive damages issue to the court. See id. at 11:24-12:1. The

Court responded:

> And I don't disagree. As I indicated, I intend to bifurcate the issue of the amount.
> The jury would find whether or not liability exists for punitive damages, but in
> terms of the amount, both financial condition and perhaps corrective or remedial
> measures taken that go solely to the issue of the amount of punitive damages
> would be tried during that phase. And that would be a factual question that then
> could be raised to the jury.

Id. at 12:1-9.

Ultimately, the Court ruled:

> Okay. So what I'm going to do, as to plaintiff's motion in limine, I am going to
> grant the motion with respect to post 2001 employment acts by defendant.
> However, defense would be entitled to admit, to the extent relevant on the liability
> phase, any acts of remediation. Now, I will say this. The bulk of that, however,
> should probably – will come in on the punitive damages phase, if we get to that
> phase, and also to the injunctive relief phase if we get to that phase. So it's
> probably going to be fairly limited.

Id. at 13:21-14:4.

After the close of evidence during the liability/compensatory damages phase, the jury was

given the following instruction on federal punitive damages:

> If you find for the plaintiffs, you may, but are not required to, award punitive
> damages to punish a defendant and to deter a defendant and others from
> committing similar acts in the future.
>
> The plaintiffs have the burden of proving that punitive damages should be
> awarded by a preponderance of the evidence. You may award punitive damages
> only if you find that Harris Farms' conduct was malicious, or in reckless disregard
> of Ms. Tamayo's rights. Conduct is malicious if it is accompanied by ill will, or
> spite, or if it is for the purpose of injuring another. Conduct is in reckless
> disregard of a plaintiff's rights if, under the circumstances, it reflects complete
> indifference to the safety and rights of others, or the defendant acts in the face of a
> perceived risk that it's actions will violate the plaintiff's rights under federal law.

Transcript of January 20, 2005, at p. 3846-47.

The jury responded "yes" to the question, "Have the plaintiffs proved by a preponderance

of the evidence that Harris Farms acted with malice or in reckless disregard of Olivia Tamayo's

federally protected rights?"  Court's Docket Document No. 211.

After the jury returned its verdict, the Court discussed the verdict form for the punitive

damages phase and evidence to be presented.  The Court asked defense counsel:

> The Court:  Otherwise as I understand the punitive damages phase, then, Plaintiffs' Exhibit 1 will be presented to the jury.  Plaintiffs' side will give an argument, defense, any evidence on behalf of defense?
>
> Defense Counsel:  No.
>
> The Court:  Then defense would argue and then we'll do the same thing.  Argument by plaintiff.  And then the jury will begin their deliberations as to amount.  And then in terms of a verdict form – okay.  Was there a proposed verdict form in the packet of verdict forms?

Transcript of January 21, 2005, at p. 4047.

With respect to the jury instruction on the punitive damages phase, the following

exchange took place:

> EEOC Counsel:  [The plaintiffs propose reading] [t]he third paragraph [of the Ninth Circuit model instruction].  Modifying it to say, "since you have found that punitive damages are appropriate," and continuing therefrom.
>
> Defense Counsel:  That's my point, Your Honor.  That's not necessarily so.
>
> The Court:  All right.  Even though they find malice and reckless disregard, they do not have to award punitive damages.
>
> EEOC Counsel:  I would say that under this instruction if they find that the amount for punitive damages is zero, they can find that.
>
> The Court:  But it would be two parts.  Basically one, as I understand it, would be are you going to award any punitive damage amount at all?  The answer is yes or no.  And they could, I suppose, answer no and then that would end the inquiry.  They could answer yes and then they would set the amount.
>
> Tamayo's Counsel:  Your Honor, that's fine.  I think we have a change of position.  That is that we will agree to the two part [process]. . . .[3]
>
> The Court:  What if I did this?  On the first paragraph, if I struck the phrase "If you find for plaintiffs" and merely state "You may but are not required to award punitive damages.  The purpose of punitive damages are to punish a

---

[3]Tamayo's counsel then suggested language for the instruction.

defendant and are to deter defendants and others from committing similar acts in the future" and then drop down to the third paragraph, which is "if you find the punitive damages are appropriate, you must use reason in setting the amount."

Tamayo's Counsel:     That's fine, Your Honor.

EEOC Counsel:          Fine with us.

Defense Counsel:       I think that works.

The Court:      All right.  That's what I will do.

Transcript of January 21, 2005, at 4049-51.

With respect to the verdict, the verdict form asked two questions: (1) "Shall punitive damages be assessed against Defendant Harris Farms, Inc.?" and (2) "We assess punitive damages against Harris Farms, Inc., as follows: $_____."[4]  Court's Docket Document No. 212.

From the motions in limine hearing, the exchanges regarding the punitive damages verdict form and instruction, and the verdict forms and instructions given, the Court does not see that *Swinton* has been violated.  At the hearing on the motions in limine, the Court indicated that remedial action could be admitted during the liability phase to the extent it may be relevant, but did inform the defense that the bulk of such evidence should come in during the punitive damages phase.

The Court did not forbid Defendant from offering the evidence at all.  Defendant could have introduced the evidence during the punitive damages phase when the jury determined the amount.  This is especially true given the instructions and verdict form.  During the liability phase, the instruction defined punitive damages and explained the Plaintiffs' burden, consistent with the Ninth Circuit model instruction.  The jury was then asked a specific question, "Have the plaintiffs proved by a preponderance of the evidence that Harris Farms acted with malice or in reckless disregard of Olivia Tamayo's federally protected rights?"  Court's Docket Document

---

[4]The jury was instructed to answer Question 2 only if it answered 'yes' to Question 1.

10

No. 211.  The jury was not asked about an amount or whether punitive damages were necessary to deter Defendant from further conduct.  The jury was simply asked if the Plaintiffs's met their burden as to liability for punitive damages.  With respect to the amount phase, the Court again defined punitive damages and instructed the jury regarding how to arrive at an amount.  The Court then asked two questions:  whether punitive damages should be awarded, and, if so, what amount.  Defendant did not object to this format and this format addressed Defendant's concern that it was "not necessarily so" that finding malice or reckless disregard requires some amount of punitive damages be awarded.  The instruction and verdict form for the second phase presented an opportunity for Defendant to present its good faith or remedial evidence and to argue that it does not need deterring.  However, Defendant chose not to introduce that evidence.  The jury's answer as to punitive damages during the first phase did not preclude Defendant from offering its evidence of good faith and remediation during the second phase, and the verdict form and instructions allowed for Defendant to argue that no punitive damages should be awarded.  It is true that the *Swinton* court held that "good faith" or remedial evidence is relevant to the issue of punitive damages, but it did not hold that such evidence had to come in at a particular point in the trial.  Swinton, 270 F.3d at 814-17.  The Court does not see a violation of *Swinton*.

Additionally, Defendant's remediation and good faith evidence occurred after Tamayo was constructively discharged in March 2001; it is therefore potentially relevant to punitive damages, but not to the issue of a prior violation of Title VII.[5]  See Swinton, 270 F.3d at 811-12; see also Gonzales v. Police Dept., City of San Jose, 901 F.2d 758, 762 (9th Cir. 1990). Defendant's evidence would not affect the jury's finding of liability or the injunctive relief, and a retrial would occur presumably only as to the issue of punitive damages.  Cf. Costa v. Desert Palace, Inc., 299 F.3d 838, 844 (9th Cir. 2003) (affirming finding of liability and award of compensatory damages but remanding for retrial on the issue of punitive damages).  This ground

---

[5]In fact, because the remediation or good faith evidence occurred after Tamayo was constructively discharged, it would be unduly confusing to the jury in evaluating liability for Defendant's conduct towards Tamayo. See Fed. Rs. Evid. 401, 403; Swinton, 270 F.3d at 811; Gonzales, 901 F.2d at 762.

1   is insufficient to support a stay.

2

3   **3.      Admission of Testimony of Matias & Hermila Barrera**

4            *Defendant's Argument*

5            Defendant argues that the testimony of the Barreras was improperly admitted as

6   impermissible bad acts by Rene Rodriguez.  Under Rule 404(b), evidence of other bad acts are

7   not admissible to prove a person's character and that he acted in conformity therewith.  Evidence

8   of other bad acts may be admitted to show other "non-character" purposes.  In order for other

9   acts to be admissible, four criteria must be met: (1) there must be sufficient proof for the jury to

10  find that the defendant committed the other act; (2) the other act must not be too remote in time;

11  (3) the other act must be introduced to prove a material fact in the case; and (4) the other act

12  must, if knowledge or intent is at issue, be similar to the offense charged.  See United States v.

13  Plancarte-Alvarez, 366 F.3d 1058, 1062 (9th Cir. 2004).  Further, evidence should still be

14  excluded if its prejudicial effect substantially outweighs its probative value under Rule 403.

15  Further, in a sexual harassment case, a plaintiff cannot testify about other acts of alleged

16  harassment against others unless the plaintiff presents admissible evidence that he/she witnessed

17  the alleged harassment or the alleged incidents were related to him/her while on the job.  See

18  Biggs v. The Nicewonger Co., Inc., 897 F.Supp. 483, 485 (D. Or. 1995).  Other act evidence is

19  only relevant if the jury could reasonably find, by a preponderance of the evidence, that the other

20  acts actually took place.  See Huddleston v. United States, 485 U.S. 681, 689 (1988).

21          Here, the key purpose of the Barrera testimony was to establish why Ms. Tamayo did not

22  report her alleged harassment sooner, but there is nothing in the Barreras's testimony that could

23  have had an impact on why she failed to report the alleged harassment sooner.  Further, Tamayo

24  never testified that the Barrera incident had any impact on why she failed to report the incidents

25  with Rodriguez sooner.  The Barreras did not testify that Rodriguez threatened to kill or hurt

26  them if Mrs. Barrera said anything.  The evidence does not establish that Rodriguez harassed

27

28                                              12

1   Mrs. Barrera at work, rather, the evidence shows that Rodriguez was giving her demeaning looks

2   at her residence, gave her an offensive note at the residence, Mrs. Barrera's foreman took care of

3   any problem, and Mrs. Barrera never saw Rodriguez during the remaining two years of her

4   employment.  Further, the testimony by the Barreras is not consistent with Tamayo's testimony.

5   The acts described by Tamayo were not the same as the acts testified to by the Barreras.  There is

6   no evidence to support Tamayo's testimony that Mr. Rodriguez threatened to beat up or hurt Mrs.

7   Barrera.  The only evidence is Tamayo's own testimony and that is insufficient foundation.

8   Further, Defendant was not duty bound to take action to prevent or investigate hostile work

9   environment sexual harassment in 1980 because such a cause had not yet been recognized.  Thus,

10  there is insufficient proof for a jury to conclude that Defendant committed the alleged other act.

11          Additionally, the incident with the Barreras was too remote as it took place 13 years prior

12  to the alleged harassment by Rodriguez and 19 years prior to when Tamayo reported Rodriguez.

13  Other courts have held that evidence was too remote were the other acts took place four years

14  prior to a complaint.  E.g. <u>Stair v. Lehigh Valley Carpenters Local Union No. 600</u>, 813 F.Supp.

15  1116, 1119-20 (E.D. Pa. 1993).

16          Additionally, the other act is not similar to any act alleged by Plaintiffs.  Looking at Mrs.

17  Barrera in a demeaning way and giving Mrs. Barrera a demeaning note is not similar to what

18  happened to Tamayo.

19          Further, given the above, any probative value that the Barreras's testimony may have had

20  is substantially outweighed by the danger of unfair prejudice.  The alleged demeaning looks and

21  note incident took place many years ago and was not similar to what Tamayo complained about.

22  This allowed Plaintiffs to unfairly argue that the other act of harassment and/or Defendants

23  failure to have an effective harassment policy was actionable.

24          Finally, Defendant did not waive its right to file a motion to strike testimony.  Although

25  Defendant filed its motion to strike 30 days after the Barreras testified, the Supreme Court has

26  made it clear that a party can file a motion to strike other act evidence at any time prior to the

27

28                                              13

1  conclusion of trial.[6]  See Huddleston v. United States, 485 U.S. 681, 690 n.7 (1988).

2  *Plaintiffs's Opposition*

3  Plaintiffs argue that the Barreras's testimony was relevant to demonstrate knowledge on

4  the part of Defendant regarding Rodriguez's behavior.  Such testimony demonstrates the state of

5  mind of Defendant in failing to recognize Rodriguez was a problem, in failing to conduct a

6  competent investigation to learn that Rodriguez had made inappropriate advances toward other

7  women, and to demonstrate that Harris Farms supervisors were aware of Mr. Rodriguez's

8  behavior.  The Court held that the evidence was admissible for this purpose.  Further,

9  Defendant's arguments are remarkable given the company's position during the argument on

10  limine motions on the issue of inappropriate sexual advances by Rodriguez against, among

11  others, Mrs. Barrera.  Defendant stated that Plaintiffs would have to prove that these incidents

12  actually occurred and that witnesses would have to come in to say that the incidents occurred.

13  When the Court stated that it was its understanding that Plaintiffs had these witnesses, defense

14  counsel stated, "That's fine.  If they call those witnesses, fine."   Moreover, defense counsel, in

15  contradiction to Defendant's argument that the inclusion of the Barreras's testimony was more

16  prejudicial than probative, reinforced the relevancy of the testimony by reading to the jury during

17  closing argument the very evidence that Defendant now characterizes as prejudicial.  Defense

18  counsel read from Tamayo's 1999 statement, which was Joint Exhibit 118, that Rodriguez told

19  her that he had a knife fight in his home territory over a woman and the woman's husband was

20  Matias Barrera.  Defense counsel also read to the jury that Rodriguez said that Matias Barrera's

21  wife was the lady he fought over and that he had remained at Defendant because the paper work

22  about the fight had been destroyed by Rafael Reyna.  As a joint exhibit, joint exhibit 118 could

23  be admitted into evidence for all purposes.

24

25  [6]In the order denying Defendant's motion for new trial, the Court held that Defendant's motion to strike was
26  untimely.  Plaintiffs argued that Defendant's motion was untimely.  In their reply, instead of citing to *Huddleston* and
   arguing that their motion was timely, Defendant argued that further objection would have been futile and was
27  therefore unnecessary.

28  14

Further, Plaintiffs argue that any concerns Defendant had could have been addressed through a limiting instruction.  Although invited by the Court to do so, Defendant never requested or suggested a limiting instruction.

Further, "Evidence as to alleged incidents of sexual harassment to which [a plaintiff] had knowledge is admissible."  <u>Biggs v. Nicewonger Co., Inc.</u>, 897 F.Supp. 483 (D. Or. 1998).  Since Tamayo learned of Mrs. Barrera through Rodriguez, who used the information to threaten and intimidate her, her testimony is completely admissible.  The testimony illustrates Tamayo's state of mind with regard to her decision not to come forward to complain earlier and also to her perception of a hostile environment.  This information came into evidence through other witnesses.  Sylvia Gomez testified that during the 1999 investigation, Tamayo gave a statement in which she revealed that Rodriguez had told her that he would fight for a woman.  The statement was part of Defendant's own exhibit, JJ at Bates No. 968, which was admitted into evidence for all purposes without objection by any party.  Defense counsel further questioned Sylvia Gomez regarding Tamayo's statements regarding the Barreras.  Gomez confirmed that Tamayo had made numerous statements about the Barreras during Defendant's investigation including that "Rene said that Juan Barrera's wife was the lady he had fought over," and "I feel like he said it to scare me."  Thus, it was clear that Tamayo had knowledge of Mrs. Barrera and the Barreras's testimony was properly admitted at trial.  Any appeal based on the inadmissibility of the Barrera's testimony would likely fail and Defendant has failed to make a strong showing of success on appeal.

### *Testimony of Hermila Barrera, Matias Barrera, & Olivia Tamayo*

1.  <u>Hermila Barrera</u>

Hermila Barrera testified on December 1, 2004, and her testimony, including direct, cross, redirect examinations is approximately twenty-six pages in the record.  <u>See</u> Trial Transcript at 347-373.  In pertinent part, Mrs. Barrera testified that:  she has four children and has been married to Matias Barrera for 30 years, <u>see</u> <u>id.</u> at 348:2-15; is from the same small village in

15

1   Mexico as Rene Rodriguez, <u>see</u> <u>id.</u> at 349:16-21; Rodriguez and her husband were friends, <u>see</u> <u>id.</u>

2   at 350:7-10; she and her husband both worked at Defendant from approximately 1979 to 1982,

3   <u>see</u> <u>id.</u> at 363:16-25 & 364:10-11; her brother-in-law, Juan Barrera, was a foreman at Defendant

4   and hired them, <u>see</u> 357:13-17 & 363:5-9; the Barreras lived on Defendant's property in

5   Defendant's housing, <u>see</u> 350:18-19 & 368:14-369:13; Rodriguez worked for Defendant at the

6   same time but did not work with Mrs. Barrera, <u>see</u> <u>id.</u> at 352:22-24 & 353:20-22; Rodriguez

7   would often carry around a pistol, <u>see</u> <u>id.</u> at 358:12-359:1 & 360:11-25; and Rodriguez would

8   come to their home about three times per week, <u>see</u> <u>id.</u> at 353:23-354:6; Mrs. Barrera hardly

9   talked to Rodriguez because "he would look at [her] on a gross demeanor from – he would look

10  at [her] like from the top to the bottom.  And he would wink his eye at [her].  <u>See</u> <u>id.</u> at 354:7-

11  13.[7]

12      Mrs. Barrera also testified to one specific instance of inappropriate behavior by

13  Rodriguez.  Mrs. Barrera testified as follows:

14      Q:      Did [Rodriguez] ever come to the home while your husband was not there?

15      **A:      He was successful on one occasion when my husband left during a meal that**
        **Harris Farms gave to the employees.  And he came to the house and gave me**
16      **a letter.  He knocked on the door.  I opened the door.  And he gives me the**
        **paper in my hand.  So then I got it, I started reading it.  And while I was**
17      **reading it, I wasn't really understanding a lot of the – a lot of the demeaning**
        **words.**

18      . . . . .

19      Q:      How did you feel when you received this letter from Mr. Rodriguez?

20      **A:      I felt very humiliated.  And with a lot of fear because of the demeaning words**
        **that were said.**

21
        Q:      What were the words that were said that made you fear?
22
        . . . .
23
        **A:      The words that he was saying on the letter the first words that I recall were**
24      **that he wanted to – he wanted to – he wanted to have a relationship with me**
        **in bed.  He wanted me to be his.  And that is what I recall.**
25
        . . . .
26

27      [7]The bulk of Mrs. Barrera's testimony related to her and her husband's work history.  <u>E.g.</u> at 351-52, 362-
        370.

28                                      16

1   Q:    Did your husband do anything in response to reading the letter?

2   **A:    I – he stayed there.  I recall he had a knife and he said in the morning . . .**
    **"I'm going to go look for him."  And I told him "No, just leave it like that."  I**
3   **was fearing that something would happen.**

4   Q:    Did you ever complain to anyone at Harris Farms about Mr. Rodriguez's conduct?

5   **A:    I complained to Mr. Juan Berrara.**

6   Q:    And what position did Mr. Barrera hold at the company?

7   **A:    He was our foreman.**

8   Q:    And did he say anything when you gave him the letter?

9   **A:    He told me that he was going to take care of everything.**

10  Q:    And did you see Mr. Rodriguez at work after that?

11  **A:    No.**

12  Id. at 354:18-357:21.

13  On cross-examination, Mrs. Barrera testified:

14  Q:    So we're clear here. [Rodriguez] never touched you; is that right?

15  **A:    Never touched me, but it offended me.**

16  Q:    When you say offended you, that's by the way he looked at you?

17  **A:    The way he looked at me.**

18  Q:    And this was when you were in your house?

19  **A:    He went to my house.  And – . . . – when he would go to my house, he would**
    **make a signal at me and wink his eye.**
20
    Q:    And that's what offended you?
21
    **A:    Yes.**
22
    Q:    And the other offensive thing you say he did is when he delivered the letter; is that
23  right?

24  **A:    Yes.**

25  Q:    Anything else?

26  **A:    And the bad words contained?**

27  Q:    The bad words contained in the letter?

28                                  17

1    **A:      That he wanted to have a sexual relationship with me.**

2    Id. at 370:21-371:15.

3    2.      Testimony of Matias Barrera

4        Matias Barrera testified on December 1, 2004, and his testimony, including direct, cross,

5    redirect examinations is approximately twenty-one pages in the record.  See Trial Transcript at

6    374-395.  Matias Barrera's testimony covered the same topic areas as his wife, including work

7    history, see id. at 374, 385-389, 391-392; and prior conversations with counsel.  See id. at 384-

8    385, 393-395.  Matias Barrera confirmed that he worked at Defendant from 1979 to 1982, see id.

9    at 376:25-377:5; that while he worked for Defendant he and his wife lived on Defendant's

10   property in Defendant's housing, see id. at 391:11-15; that his brother Juan Barrera was a

11   foreman at Defendant, see id. at 377:8:-17; that he and Rodriguez were from the same town in

12   Mexico, see id. at 375:4-7; that he and Rodriguez used to be friends, see id. at 375:13-16; that

13   Rodriguez used to come to the Barreras's home about three times per week, see id. at 376:17-18;

14   that Rodriguez had a .22 cal. pistol that he would carry in the waist of his pants, see id. at 381:2-

15   25;[8] that Rodriguez's nephew, Rafael Reyna, was a foreman at Defendant while Matias Barrera

16   worked for Defendant, see id. at 380:5-12; and that he and Rodriguez did not work together at

17   Harris Farms.  See id. at 376:21-22.

18       With respect to Rodriguez's behavior towards his wife and the ensuing confrontation,

19   Matias Barrera testified:

20   Q:      Are you friends with [Rodriguez] now?

21   **A:      No.**

22   Q:      Why not?

23   **A:      Because he made a mistake.**

24   Q:      What kind of mistake?

25   **A:      Having been disrespectful to my wife.**

26   _____

27      [8]Neither Hermila nor Matias used the word "pistol," but the description of the gun is consistent with a pistol and inconsistent with a rifle.

28                                          18

1    Q:    How was he disrespectful to your wife?

2    **A:    Through a letter he sent to her.  He gave to her.**

3    Q:    Why was the letter disrespectful?

4    **A:    Because it said bad things.**

5    Q:    And why did you – why did you believe these bad things that were said were

6          disrespectful?

7    **A:    In the sense of the words that it said.  It was that he wanted to have a sexual
           relationship with her.**

8

9    Q:    When was it – when was it that this event happened?

     **A:    In 1980.**
10

11   . . . .

     Q:    What did you do when you found out that Mr. Rodriguez had given your wife this
12         letter?

13   **A:    I went looking for him.**

14   Q:    And did you find him.

15   **A:    Yes.**

16   Q:    And what did you do?

17   **A:    I tried to beat him up, but they took him away from me.**

18   Q:    Who took him away from you?

19   **A:    The person that was living with him.**

20   . . .

21   Q:    And when you saw him, where were you?

22   . . .

23   **A:    When I saw him, I was at his – at his house, at his trailer.**

24   Q:    Was that on Harris Ranch property?

25   **A:    Yes.**

26   . . .

27   Q:    Did you ever complain to anyone at Harris Farms about Mr. Rodriguez' conduct?

28                                       19

1    **A:**    **Yes.**

2    Q:    Who?

3    **A:**    **With Juan Berrara.**

4    Q:    And I'm sorry, did you tell me what Juan Barrera – what was Juan Barrera's

5    position?

6    **A:**    **Foreman.**

7    Q:    And what did he say when you told him?

8    **A:**    **"I'll take care of this."**

9    Q:    So what did he do, if you know?

10   **A:**    **I don't know.  I did not know.**

11   Q:    Well, did you ever see Mr. Rodriguez after that?

12   **A:**    **No.**

13   <u>Id.</u> at 375:15-376:5; 379:1-20; 380:13-381:1.  After the confrontation with Rodriguez, Matias

14   Barrera never saw Rodriguez again, but continued to work for Defendant until 1982.  <u>See id.</u> at

15   391:1-10.

16   *<u>Testimony of Olivia Tamayo</u>*

17   Olivia Tamayo's testimony spanned over a four trial-day period, January 7 through

18   January 13, 2005, and her entire testimony is approximately five hundred pages in the record.

19   <u>See</u> Trial Transcript at pp. 2916-3505.[9]  Ms. Tamayo testified that Mr. Rodriguez had raped her

20   on several occasions.  After the first time, Tamayo testified:

21   Q:    When we concluded last Friday, I had just about gotten through the rape incident
          with you on the first occasion that you were raped. Can you tell us, please,
22        whether or not there was any mention during the time that you were there being
          raped by Mr. Rodriguez of the Barrera name?
23

24   **A:**    **Yes.**

25   Q:    What did he say about the Barrera name?

26   _____

27   [9]Tamayo's testimony was interrupted when two witnesses where examined out of order.  Additionally, other
     pages in this series are conversations outside the presence of the jury.

28                                        20

1  A:  **He told me and pulled out a knife, and tells me, "With this knife and this gun, I fought with a woman, the sister-in-law of Juan Barrera."**

2

3  Q:  Did he tell you anything more about this incident involving the sister-in-law of Juan Barrera at that time?

4  A:  **He says, "And with this one, I'm going to fight against you.  Because when I like a woman, I don't mind fighting."**

5

6  Q:  Had you heard of Hermila Barrera at that time? Or prior to that time?

7  A:  **No.**

8  Q:  Did Rene Rodriguez say anything about what he would do to your husband if you told him about the rape?

9  A:  **He told me that if I was to tell my husband, he could kill my husband.**

10  Q:  Did you report this incident of sex harassment to anyone at that time, ma'am?

11  A:  **No.**

12  Q:  Why did you not report it at that time?

13  A:  **Because he said if I was to report it, no one would believe it.  And I was very frightened.  Because he showed a gun.  And I was very frightened.**

14

15  Q:  Did your fright have anything to do with your husband or your children?

16  A:  **Yes.  Because if I make a complaint or was to tell my husband, I was afraid that my husband would confront Rene and Rene would then kill him.  Or that my husband do something against Rene and end up in jail.  And I had my children.  They were teenagers.**

17

18  Id. at 3021:22-3023:10.

19  Similarly, in cross-examination, Tamayo testified:

20  Q:  All right.  And then did you – did Rene get back in the driver's seat of the truck?

21  A:  **No, I recall that he put the gun in his waist.  And then – and he pulled out a knife.  And said that with that gun and with that knife, he had fought for a woman.  That he had fought for a woman.**

22

23  Id. at 3244:4-9.

24  Additionally, when Tamayo reported Rodriguez to Defendant's human resources

25  department, the human resources department interviewed Tamayo.  According to the notes of

26  that meeting and the testimony of Shirley Ollech, Tamayo told human resources:

27  He said that with that knife he had a fight in his home territory over a woman.

28  21

The woman's husband was Juan Barrera. . . . Rene said he wasn't afraid to fight for a woman he wanted because he had already done that. . . . Rene said that Juan Barrera's wife was the lady he fought over.  He was able to continue to work here because the paperwork about the fight had been destroyed by Rafael Reyna.  I [Tamayo] don't know if its true or if he just said it so I would be scared.  I feel like he said it to scare me.  If I had come to the office Rafael Reyna was here and then I'd be scared that Rene would find out.

Id. at 1738:8-1739:24.

*Discussion*

Evidentiary rulings are reviewed by appellate courts for an abuse of discretion.  McEuin v. Crown Equipment Corp., 328 F.3d 1028, 1032 (9th Cir. 2003).  An appellate court "may affirm an evidentiary ruling on any ground supported by the record, regardless of whether the district court relied on the same grounds or reasoning [the appellate court] adopt[s]."  United States v. Pang, 362 F.3d 1187, 1192 (9th Cir. 2004) (citing Atel Financial Corp. v. Quaker Coal Co., 321 F.3d 924, 926 (9th Cir. 2003)); see Gilbrook v. City of Westminster, 177 F.3d 839, 859 (9th Cir. 1999); United States v. Click, 807 F.2d 847, 850 n.5 (9th Cir. 1987).  Once an evidentiary ruling is found to be erroneous, appellate courts begin with a presumption of prejudice, but that presumption may be rebutted by a showing that it is more probable than not that the jury would have reached the same verdict even if the evidence had been admitted.  Obrey v. Johnson, 400 F.3d 691, 701 (9th Cir. 2005).

In order to admit "other act" evidence under Rule 404(b), a four part test must be met: (1) there must have been sufficient proof for the jury to find that defendant committed the act; (2) the other act must not have been too remote in time; (3) the other act must have been introduced to prove a material issue in the case; and (4) the other act must, in some cases, have been similar to the offense charged.  See Duran v. City of Maywood, 221 F.3d 1129, 1132-33 (9th Cir. 2000).  Even if the *Duran* test is met, Rule 403 may still prohibit admission of the evidence.  Id. at 1133.

The Court does not believe that Defendant has sufficiently shown a strong probability of success on appeal.  The testimony of Matias Barrara alone is sufficient for a jury to find that he and Rodriguez fought and that the fight was because of Rodriguez's inappropriate conduct towards, and propositioning of, Barrera's wife.  Matias Barrera's testimony is also sufficient for

22

the jury to find that both Rodriguez's conduct toward Hermila Barrera and the fight occurred on Defendant's property and that at least one of Defendant's foremen, Juan Barrera, was informed and knew about Rodriguez's conduct and the fight.  In fact, although it could be argued that the fight was a purely private matter, the Barreras thought it appropriate to contact one of Defendant's foremen.

It is true, as Defendant argues, that the Rodriguez-Barrera fight occurred approximately 13 years prior to Tamayo reporting Rodriguez to Defendant.  What Defendant does not acknowledge is that Rodriguez used the otherwise "stale" incident as part of his harassment of Tamayo.  It is only because of Rodriguez that Tamayo even knew about the fight with Matias Barrera over Barrera's wife.  Rodriguez's use of the fight makes the fight and the Barrera situation part of the then current environment facing Tamayo.  Because of that use, the Court cannot conclude that the Barrera incident is too stale.

The testimony of the Barreras was admissible to show a hostile environment and to show state of mind by Tamayo.  As discussed above, since Rodriguez told Tamayo about the Barrera fight, it became part of the environment facing Tamayo.  Further, Tamayo testified that she did not report the first rape because she was scared and fearful based on what Rodriguez had told her.  See Trial Transcript at 3022:24-3023:10.  Although the immediate source of the fear appeared to be Rodriguez's gun, Rodriguez told Tamayo that he had used the gun to fight for a married woman.  The Barrera fight was therefore part of the entire "transaction" and was used by Rodriguez to enhance the threat of the gun.  Also, the Court did not expressly pass on the issue of Defendant's knowledge, and acknowledged this in proceedings outside the presence of the jury.  However, the Court did not forbid use of the evidence to show knowledge by Defendant and, given Juan Barrera's position with Defendant as a foreman, it is not clear that use of the evidence to show knowledge was improper.

Finally, with respect to the similarity of conduct, the Barrera situation does not precisely parallel Tamayo's situation.  However, other instances of harassment may be used to show a hostile environment if the plaintiff has knowledge thereof.  E.g. Brooks v. City of San Mateo,

23

1    229 F.3d 917, 924 (9th Cir. 2000); Hirase-Doi v. U.S. West Communs., Inc., 61 F.3d 777, 782

2    (10th Cir. 1995); Hall v. Gus Constr. Co., 842 F.2d 1010, 1014-1015 (8th Cir. 1988); Taylor v.

3    Cameron Coca-Cola Bottlling Co., 71 Empl. Prac. Dec. (CCH) P44967 (W.D. Pa. 1997); Briggs,

4    897 F.Supp. at 483.  Rodriguez himself told Tamayo about Mrs. Barrera and the fight.  Although

5    the Barreras's testimony shows that Rodriguez did not touch or assault Mrs. Barrera, the conduct

6    was clearly inappropriate, was sexual in nature, was unwelcomed, and caused violence.  Sexual

7    harassment may not have been recognized in 1980, but sexual mores have not changed so much

8    that Rodriguez's conduct towards Mrs. Barrera could not be considered improper in 1980 or

9    2006.  Further, Tamayo also testified that Rodriguez would give her inappropriate notes, see

10   Trial Transcript at 3058:22-3059:19, and one of the rapes occurred at Tamayo's home.  See id. at

11   3032:3-9.  Similarly, Maria Martinez testified that she received inappropriate telephone calls

12   from Rodriguez while she was at home, see id. at 592, Rodriguez parked in front of her home

13   during non-working hours, see id. at 596:24-597:1, and the trailer in which Martinez and her

14   husband were living was parked on Defendant's property.  See id. at 622:6-11.  It is also true that

15   Rodriguez's conduct towards Mrs. Barrera did not occur while working, but the testimony is that

16   the conduct and fight occurred on Defendant's property and the Barreras felt it appropriate to

17   complain to Defendant's management.  Furthermore, although Matias Barrera's testimony

18   indicates that Matias was the instigator of the fight, his testimony confirms that there was a fight

19   and the reason for the fight was Rodriguez's inappropriate sexual conduct towards Mrs. Barrera.

20          However, even if the situation between Barrera and Rodriguez was not sufficiently

21   similar and the Court erred in not striking the testimony, Defendant has not shown that the error

22   was prejudicial.  For purposes of arguing the merits on appeal, once Defendant shows evidentiary

23   error, Plaintiffs then have the burden of showing harmlessness.  See Obrey, 400 F.3d at 701.  For

24   purposes of this stay, Defendant must show a strong probability of success on appeal.  See

25   Hilton, 481 U.S. at 776.  Defendant has not attempted to show harm before this Court and instead

26   relies on the appellate presumption of harm. However, given the burdens at the appellate level

27   versus the district court level, Defendant should show that Plaintiffs will likely not be able to

28                                                    24

show harmlessness or that the evidence was likely harmful.  Considering the entirety of this case, it appears likely that Plaintiffs would be able to show harmlessness.

The Barreras's testimony was a very small part of this trial.  Of the 3,500+ pages of testimony, the Barreras testimony accounted for only 50 pages.  Of those 50 pages, most of the testimony covered rather mundane issues, primarily work history.  Of the approximately 25 witness who gave testimony in this case, the Barreras were relatively minor witnesses and their testimony was not nearly as extensive as Tamayo, Sylvia Gomez, Rene Rodriguez, and Shirley Ollech.  In fact, the Barreras's testimony concerning Rodriguez's behavior and the fight amounts to approximately 4 pages of testimony.  Further, as outlined above, the testimony was not particularly inflammatory.  If Defendant is correct that the Barrera incident is so dissimilar and stale as to be irrelevant, then, considering the massive quantity of other relevant evidence that the jury received, it does not seem likely that the jury would be unduly influenced by the Barreras's testimony.  Also, Defendant was able to cross examine the Barreras and address their testimony as it saw fit during the closing argument.  Considering the shear volume of evidence, both documentary and testimonial, and the limited nature of the Barreras's testimony, it does not seem likely that the error was prejudicial.  Although Defendant may have shown a possibility of success on appeal, the Court does not believe that it has shown a sufficient probability of success on appeal.

## CONCLUSION

"A party seeking a stay of a lower court's order bears a difficult burden."  Private Sanitation, 44 F.3d at 1084.  In order to meet its burden, Defendant has relied primarily on attempting to show a strong probability of success on appeal.  The Court believes that Defendant has not shown a strong probability of success on appeal and, at most, has shown a possibility of success on appeal.  Additionally, the irreparable harm that Defendant could suffer is very slight and Defendant has not presented evidence that establishes the nature or extent of any harm that it would suffer.  Additionally, Defendant did not adequately address the interests of third parties or

the public interest.  From the findings of fact and conclusions of law, there is a danger of

retaliation against other employees.  Additionally, the EEOC is generally deemed to represent the

public interest.  Therefore, the *Hilton* factors do not tip the scales in Defendant's favor and a stay

pending injunction is inappropriate.

Accordingly, IT IS HEREBY ORDERED that:

1.      Defendant's Rule 62(c) motion for temporary stay is DENIED; and

2.      The temporary stay will be dissolved and the injunction will go into effect on July 14,

2006.

IT IS SO ORDERED.

**Dated:    June 30, 2006**                            **/s/ Anthony W. Ishii**
0m8i78                                                          UNITED STATES DISTRICT JUDGE